*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0148p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
AFL-CIO, and TEAMSTERS LOCAL UNION NO. 2727,
*Plaintiffs-Appellants,*

No. 05-5478

*v.*

UNITED PARCEL SERVICE CO.,
*Defendant-Appellee.*

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 03-00675—John G. Heyburn II, Chief District Judge.

Argued: January 24, 2006

Decided and Filed: April 26, 2006

Before: SILER, SUTTON, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Roland Wilder, Jr., BAPTISTE & WILDER, Washington, D.C., for Appellants. Tony C. Coleman, FROST BROWN TODD LLC, Louisville, Kentucky, for Appellee. **ON BRIEF:** Roland Wilder, Jr., Katherine A. McDonough, BAPTISTE & WILDER, Washington, D.C., for Appellants. Tony C. Coleman, David L. Hoskins, FROST BROWN TODD LLC, Louisville, Kentucky, for Appellee.

---

## OPINION

---

SUTTON, Circuit Judge. Section 3 of the Railway Labor Act (RLA), Pub. L. No. 442, 48 Stat. 1185 (1934) (codified as amended at 45 U.S.C. § 151 *et seq.*), grants adjustment boards exclusive jurisdiction to resolve disputes over the "interpretation or application of [collective bargaining] agreements" affecting the railroad and airline industries. At issue in this case is a claim by the International Brotherhood of Teamsters (the union) that it has a right to designate a representative on a safety committee established by its collective bargaining agreement with United Parcel Service (UPS). The district court dismissed the suit, concluding that it fell within the exclusive jurisdiction of the adjustment board. The union responds that the dispute lies outside of the board's exclusive jurisdiction because it involves a dispute between labor and management about the "[d]esignation of representatives." § 2, Third. Concluding that the union has construed the

1

board's exclusive jurisdiction in § 3 too narrowly and the term "representatives" in § 2, Third too broadly, we affirm.

## I.

The union represents maintenance technicians and other workers employed by UPS at 88 "gateways" across the country (hubs for the company's airborne shipping business). UPS and the union entered into a collective bargaining agreement that established, among other things, a safety committee at each of the larger gateways. Representatives of both parties sit on these safety committees, where they work together to address the safety concerns of employees at the gateways. At gateways with fewer than 20 employees, the Local 2727 Safety Committee chairman works with UPS's safety manager to resolve employee safety concerns.

In April 2003, Local 2727 hired John J. Tulipana, Jr. to be (1) its Safety Committee Chair and (2) the Union Chair of the Louisville Gateway Safety Committee. UPS, however, refused to acknowledge Tulipana as chair of the Louisville Committee, arguing that the collective bargaining agreement mandated that a UPS employee hold the position. On November 3, 2003, the union filed this lawsuit in the United States District Court for the Western District of Kentucky, seeking a declaratory judgment and injunctive relief under § 3 of the Railway Labor Act. Claiming that UPS had refused "to 'treat' with Mr. Tulipana on health and safety issues," the union complained that "UPS has interfered with its employees' choice of representative and has violated § 2, Third and Fourth of the Act." JA 9. UPS filed a motion to dismiss for lack of jurisdiction, which the district court granted. Even if UPS had failed to "treat with" Tulipana in this safety committee position, the district court held that "the dispute . . . qualified as 'minor' under the Railway Labor Act [and] was committed to the exclusive jurisdiction of the system adjustment board." D. Ct. Op. at 24, 26.

## II.

The union appealed. We give fresh review to a district court's decision to dismiss a suit for lack of statutory jurisdiction. *Airline Prof'ls Ass'n of the Int'l Bhd. of Teamsters v. ABX Air, Inc.*, 274 F.3d 1023, 1027 (6th Cir. 2001).

## A.

Enacted in 1926, the Railway Labor Act was designed to "avoid any interruption to commerce or to the operation of any [railroad] engaged therein" caused by labor-management disputes. 45 U.S.C. § 151a(1); *see also* H. R. Rep. No. 328, at 1 (1926) (noting that the Act would ensure "continuity and efficiency of interstate transportation service, and [ ] protect the public from the injuries and losses consequent upon any impairment or interruption of interstate commerce through failures of managers and employees to settle peaceably their controversies"). In 1936, Congress extended the Act to "every common carrier by air engaged in interstate or foreign commerce." Act of April 10, 1936, Pub. L. No. 487, 49 Stat. 1189 (codified at 45 U.S.C. § 181).

In attempting to prevent labor disputes from crippling freight and passenger delivery in the railway and airline industries, the Act divides labor disputes into four categories: representation disputes, major disputes, minor disputes and collateral disputes governed by independent state or federal laws. Representation disputes are governed by § 2, Ninth of the Act and address conflicts that arise before certification of a union and that concern who will represent employees in future labor negotiations. *See Virginian Ry. Co. v. Ry. Employees*, 300 U.S. 515, 543 (1937) ("[The] employees' free[dom] to organize and to make choice of their representatives without the 'coercive interference' and 'pressure' of a company union . . . [and the statutory protection of] the freedom of choice of representatives . . . .  was continued and made more explicit by [§ 2, Third and Fourth].");*see also W. Airlines, Inc. v. Int'l Bhd. of Teamsters*, 480 U.S. 1301, 1302–03 (1987) (O'Connor, Circuit Justice) ("Representation disputes involve defining the bargaining unit and

determining the employee representative for collective bargaining. Under § 2, Ninth, of the Act, the National Mediation Board has exclusive jurisdiction over representation disputes.") (internal quotation marks omitted).

"Major disputes" occur after certification "over the formation of collective agreements or efforts to secure them" and "arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Elgin, Joliet & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945); *see also Pittsburgh & Lake Erie R.R. Co. v. Ry. Labor Executives' Ass'n*, 491 U.S. 490, 496 n.4 (1989) ("Disputes about proposals to change rates of pay, rules, or working conditions are known as major disputes."); *Burlington N. R.R. Co. v. Bhd. of Maint. of Way Employees*, 481 U.S. 429, 432 (1987) ("A dispute over the formation of collective agreements or efforts to secure them is a 'major dispute' in the parlance of railway labor law and is governed by the Railway Labor Act.") (citation and quotation marks omitted); *Atchison, Topeka & Santa Fe R.R. Co. v. Buell*, 480 U.S. 557, 562–63 (1987) (labeling "'major disputes' [as] those arising out of the formation or change of collective bargaining agreements covering rates of pay, rules, or working conditions") (internal quotation marks and brackets omitted).

A minor dispute "contemplates the existence of a collective agreement . . . . The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. . . . In either case the claim is to rights accrued, not merely to have new ones created for the future." *Burley*, 325 U.S. at 723; *see also Hawaiian Airlines v. Norris*, 512 U.S. 246, 252–54 (1994) ("[M]inor disputes[] grow out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions. Minor disputes involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation[,] . . . . develop from the interpretation and/or application of the contracts between the labor unions and the carriers . . . . [and] pertain[] only to disputes invoking contract-based rights.") (internal quotation marks and citation omitted); *Pittsburgh & Lake Erie R.R. Co.*, 491 U.S. at 496 ("Minor disputes are those involving the interpretation or application of existing contracts."); *Buell*, 480 U.S. at 563 ("[A] minor dispute . . . grow[s] out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.") (internal quotation marks omitted); *cf. Conrail v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 302 (1989) ("This Court . . . . adopted the major/minor terminology, drawn from the vocabulary of rail management and rail labor, as a shorthand method of describing two classes of controversy Congress had distinguished in the RLA: major disputes seek to create contractual rights, minor disputes to enforce them."); *id.* at 307 ("Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major.").

Finally, disputes over rights granted by other provisions of federal and state law, which are not otherwise covered by any of the previous dispute categories, are largely unaffected by the Act. *Hawaiian Airlines*, 512 U.S. at 260 ("[A] state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the CBA."); *id.* at 265–66 ("This 'arguably justified' standard, however, was employed only for policing the line between major and minor disputes. Recognizing that accepting a party's characterization of a dispute as 'minor' ran the risk of undercutting the RLA's prohibition against unilateral imposition of new contractual terms, the Court held that a dispute would be deemed minor only if there was a sincere, nonfrivolous argument that it turned on the application of the existing agreement, that is, if it was 'arguably justified' by that agreement. Obviously, this test said nothing about the threshold question whether the dispute was subject to the RLA in the first place. . . . Accordingly, we agree with the Supreme Court of Hawaii that respondent's claims for discharge in violation of public policy and in violation

of the Hawaii Whistleblower Protection Act are not pre-empted by the RLA."); *Buell*, 480 U.S. at 565, 567 ("It is inconceivable that Congress intended that a worker who suffered a disabling injury would be denied recovery under the [Federal Employee Liability Act (FELA)] simply because he might also be able to process a narrow labor grievance under the RLA to a successful conclusion. . . . As far as a worker's right to damages under the FELA is concerned, Congress' enactment of the RLA has had no effect.").

How a dispute is characterized affects the path for resolving it. Representation disputes are committed to the jurisdiction of the National Mediation Board by § 2, Ninth of the Act, which gives the Board authority to investigate and resolve such disputes, ensuring that the selection of collective-bargaining representatives occurs without "interference, influence, or coercion." 45 U.S.C. § 152 (9). The decision of the National Mediation Board to certify a particular representative under § 2, Ninth of the Act is final and not reviewable in federal court. *See Switchmen's Union of N. Am. v. Nat'l Mediation Bd.*, 320 U.S. 297, 303 (1943) ("Where Congress took such great pains to protect the Mediation Board in its handling of an explosive problem, we cannot help but believe that if Congress had desired to implicate the federal judiciary and to place on the federal courts the burden of having the final say on any aspect of the problem, it would have made its desire plain."); *W. Airlines, Inc.*, 480 U.S. at 1302–03 (O'Connor, Circuit Justice) ("'Representation' disputes involve defining the bargaining unit and determining the employee representative for collective bargaining. Under § 2, Ninth, of the Act, the National Mediation Board has exclusive jurisdiction over representation disputes.").

The Act provides "two distinct routes for settlement" of major and minor disputes. *Burley*, 325 U.S. at 724. After an initial stage of mandatory negotiation, major disputes are subject to mediation by the National Mediation Board (created by the Act), voluntary arbitration and eventually the possibility of presidential intervention. *Id*. at 725. If each procedure is tried and fails, the parties may resort to other legal tactics, such as strikes, lockouts or other forms of economic self-help. *Id*.

To address "minor disputes," Congress amended the Act in 1934 to give the National Railroad Adjustment Board power to settle such disputes definitively. *Id*. at 726–27; Act of June 21, 1934, Pub. L. No. 442, 48 Stat. 1185 (codified as amended at 45 U.S.C. § 151 *et seq*.). After the 1934 amendments, if either party filed a "minor" dispute with the Board, the Board had "exclusive primary jurisdiction" to issue a decision that was binding as to both parties. *Pa. R.R. Co. v. Day*, 360 U.S. 548, 550 (1959) (noting that "the National Railroad Adjustment Board ha[s] exclusive primary jurisdiction over disputes between unions and carriers based on the provisions of a collective bargaining agreement").

In 1936, Congress extended most of the obligations and rights established by the Act to the airline transport industry, requiring the parties to use "system, group, or regional boards of adjustment," instead of the National Railroad Adjustment Board, to resolve minor disputes. *Int'l Ass'n of Machinists v. Cent. Airlines, Inc.*, 372 U.S. 682, 686 (1963). Congress gave the system boards the same exclusive jurisdiction over "minor disputes" in the airline industry that the National Railroad Adjustment Board has over such disputes in the railroad industry. 45 U.S.C. § 184 (noting that minor disputes "shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to an appropriate adjustment board"); *see also Hawaiian Airlines*, 512 U.S. at 258; *W. Airlines, Inc.*, 480 U.S. at 1303 (O'Connor, Circuit Justice). Save for relying on system boards rather than the National Railroad Adjustment Board as the forum for minor-dispute resolution, the Act makes the resolution process and its applicability to minor disputes identical for the airline and railway industries. *Cent. Airlines*, 372 U.S. at 689 ("The statute directed that minor disputes be handled on the property in the usual

manner, but failing adjustment either party could take the matter to the adjustment board, which was to hear and decide it. This provision is applicable both to rail [ ] and air [ ] carriers.").

Federal courts may enjoin strikes arising from minor disputes, *Conrail*, 491 U.S. at 304, and may enjoin efforts to change the status quo during the resolution of a major dispute, *id*. at 302–03. Parties may also seek review of arbitration decisions in federal court, though "[j]udicial review of these Boards' determinations has been characterized as 'among the narrowest known to the law.'" *Buell*, 480 U.S. at 563.

Finally, employment disputes not pre-empted by the dispute resolution procedures in the Act are resolved in the manner dictated by the appropriate state or federal law. So, for example, claims under the Federal Employer Liability Act may be filed in federal court, *see Buell*, 480 U.S. at 564; claims under a state's wrongful termination law may be filed in state court, *see Hawaiian Airlines*, 512 U.S. at 264; and claims under § 3, First of the Railway Labor Act for protection from discrimination by a bargaining representative may be filed in federal court, *see Conley v. Gibson*, 355 U.S. 41, 44–45 (1957); *Bhd. of R.R. Trainmen v. Howard*, 343 U.S. 768, 774–75 (1952).

B.

In assessing whether the union may bring this claim in federal court, the parties share three pieces of common ground. They agree that the dispute arises under the Railway Labor Act and not under an independent state or federal law. They agree that this dispute is not a "representation" dispute under § 2, Ninth of the Act, requiring investigation and resolution by the National Mediation Board. And they agree that this was not a "major" dispute, which is to say it was not a dispute regarding the formation of a collective bargaining agreement. They part company, however, over (1) whether the dispute was a "minor" one subject to the exclusive jurisdiction of the system adjustment board and (2) whether, even if the dispute was a minor one, the union has a separate statutory right to bring this claim against UPS in federal court under § 2, Third.

We begin by addressing the union's claim that this is not a minor dispute. Minor disputes, the Supreme Court has held, "involve controversies over the meaning of an existing collective bargaining agreement in a particular fact situation." *Hawaiian Airlines*, 512 U.S. at 253 (internal quotation marks omitted). A conflict thus is "minor" "[i]f the disputed action of one of the parties can arguably be justified by the existing agreement or . . . if the contention that the labor contract sanctions the disputed action is not obviously insubstantial." *Conrail*, 491 U.S. at 306 (internal quotation marks omitted). The Act imposes a "relatively light burden" on a railroad or airline to "establish[] exclusive arbitral jurisdiction under the RLA": So long as the "employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement." *Id*. at 307.

In this instance, UPS has shown that its action was "arguably justified by the terms of the parties' collective-bargaining agreement." The company "assert[ed] a contractual right" to refuse to recognize Tulipana as the union's representative on the Louisville Safety Committee. In a letter dated April 2, 2003, UPS's Labor Manager, Bob Ragar, explained to the President of Local 2727, Joe Darmento, that "Article 20, Section 4 [(b), (c) and (d)] of the CBA clearly refers to [the] individuals being on or chairing the safety committees as being employees. Mr. Tulipana does not meet this criteria." JA 109. In a subsequent letter, dated April 30, 2003, Ragar stated that Article 20, § 4 of the collective bargaining agreement limits membership on the safety committees to "UPS employees who are 2727 members and appropriate Company representatives." JA 89. Noting that there had never been a member of a safety committee who was not an employee of UPS, Ragar added that "[n]othing has changed in the contract to now allow such [a] practice." *Id*. Connie Clifton, the Aircraft Maintenance Health and Safety Manager for UPS, also noted in a letter to

Darmento, dated June 27, 2003, that "[t]he question of whether Mr. Tulipana can be on the Safety Committee is simply a contractual issue."  JA 110.

Under these circumstances, the collective bargaining agreement "arguably justified" UPS's interpretation.  The contract does not directly say that union representatives on the safety committee must be UPS employees.  But it does say many other things intimating that union representatives should be UPS employees.  *See* Article 20, § 4(b), JA 81 ("Participation [on safety committees] by employees who are covered by this agreement will be voluntary."); *id*. § 4(c), JA 81–82 ("Time spent in committee meetings by designated committee members shall be without loss of time or pay. Should the committee meeting occur during hours that are other than the employee's normal work shift, the hours will be paid at straight time rates and shall not be considered hours worked for overtime pay calculations.  Committee members who are already working at an overtime rate when a meeting is scheduled shall be replaced by an alternate."); *id*. § 4(d), JA 82 (A committee member "shall be permitted reasonable time by the immediate supervisor to investigate . . . without loss of time or pay.  It is understood that such investigations shall not interfere with the performance and completion of [the member's] regular assigned duties.").  Even the compensation provision for the job that the union wants Tulipana to hold shows that the parties contemplated that an employee would fill the position.  *See id*. § 4(c), JA 82 ("Time spent in committee meetings by the designated Union gateway safety committee chairperson at locations having more than twenty-five employees covered by this Agreement shall be compensated at the appropriate straight or overtime rate of pay in accordance with hours worked in his work week, regardless of the Union gateway safety committee chairperson's regular assigned shift.") (emphasis added).

Because the safety committees owe their creation to the collective bargaining agreement and cannot exist independently of it, the staffing of the committees "may be conclusively resolved by interpreting the existing [collective bargaining agreement]." *Conrail*, 491 U.S. at 305.  Section 4(a) of Article 20 creates the committees in order to encourage the parties "to cooperate with and assist each other in maintaining safe, healthful, and sanitary working conditions and in preventing work-related accidents."  JA 81.  Section 4(b) of the agreement lays out the specific numbers of representatives that will sit on each committee, noting that "[n]o other participants will attend without mutual agreement by the committee."  *Id*.  Because the agreement places explicit limitations on the membership of the safety committees (*e.g.*, membership must be voluntary and only certain numbers of individuals may sit on the committees), the agreement also represents the most likely source for determining whether members of those committees must be employees.  Proving the point:  in a previous dispute between the parties over whether UPS could appoint an employee of its insurance company to the same safety committee, the union wrote to UPS that such an individual "is not permitted to be a member of any UPS/Local 2727 Joint Safety and Health Committees under the current Labor Agreement," noting further that "I recommend that you review the Collective Bargaining Agreement . . . for guidance with future decisions."  JA 112.

Bearing in mind UPS's "relatively light burden" in showing that this dispute turns on an interpretation of the collective bargaining agreement, we conclude that its claims are "arguably justified" by the agreement and that the dispute can be "conclusively resolved" through interpretation of that contract.  The company's refusal to acknowledge Tulipana as union chairman of the Louisville Safety Committee thus constitutes a "minor dispute" under the Act, placing it within the exclusive jurisdiction of the system adjustment board.

C.

The union argues that even if this controversy fits within the "minor dispute" rubric, the federal courts retain jurisdiction under § 2, Third of the Act.  That provision of the Act says:

> Designation of representatives.  Representatives, for the purposes of this Act shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives.  Representatives of employees for the purposes of this Act need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

45 U.S.C. § 152(3).  By refusing to recognize Tulipana as its representative on the safety committee, the union argues (1) that UPS violated this provision and (2) that the federal courts have jurisdiction to cure the violation.  We disagree with each premise of this argument and necessarily reject its conclusion.

Tulipana, to begin, is not a "representative" within the meaning of § 2, Third.  The provision protects the rights of employees to choose their own "collective bargaining representative[]," *Gen. Comm. of Adjustment v. Mo.-Kan.-Tex. R.R. Co.*, 320 U.S. 323, 329 (1943), not to choose any member of any committee ever set up by a collective bargaining agreement, whether called a "representative" or not.  Numerous Supreme Court decisions confirm the point.  *See Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 759 (1961); *Order of R.R. Conductors v. Pa. R.R. Co.*, 323 U.S. 166, 172 (1944) (recognizing that § 2, Third protected the employees' choice of a "bargaining representative"); *Mo.-Kan.-Tex. R.R. Co.*, 320 U.S. at 329 ("Thus Congress stated in § 2, Third of the 1926 Act that the choice by employees of their collective bargaining representatives should be free from the carriers' coercion and influence."); *Virginian R.R. Co.*, 300 U.S. at 548.

In addition to this authority, § 2, Third twice states that it applies to representatives "for the purposes of this Act," not to representatives for any purposes the union chooses to use them.  Read in conjunction with other parts of the section, the provision concerns the collective-bargaining process and other interactions between employer and employee that occur before the parties enter into (or re-negotiate) a collective bargaining agreement.  All of which would seem to explain why the Court has observed that § 2, Third and Fourth, as amended in 1934, address "primarily the precertification rights and freedoms of unorganized employees." *Trans World Airlines, Inc. v. Indep. Fed'n of Flight Attendants*, 489 U.S. 426, 440 (1989).  Had Mr. Tulipana been the representative of UPS employees for negotiating a collective bargaining agreement with the company, that might have been a different matter.  Were that the case and were the dispute not a "major" one, the court might have jurisdiction to determine whether § 2, Third prevented UPS from interfering with his ability to carry out that duty.  But since this dispute contemplates representation only on a committee created by the collective bargaining agreement, a conflict over Tulipana's service on that committee represents a "dispute[] growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions," 45 U.S.C. § 151a(5), namely a "minor dispute" that the Act subjects to mandatory arbitration.

Nor are we aware of any case that holds differently—that holds in other words that the requirements of § 2, Third extend beyond the collective bargaining context.  Contrary to the union's suggestions, *Texas & New Orleans Railroad Co. v. Brotherhood of Railway & Steamship Clerks*, 281 U.S. 548 (1930), involved collective bargaining representation, arising as it did from an employer that started its own union and tried to pressure its employees into joining it.  Nowhere in that case, or in any other, have we been able to find the slightest indication that Congress meant "representatives" in this provision to apply outside of that context. *Cf. Salcedo v. Norfolk & W. Ry. Co.*, No. 82-1766, 1983 U.S. App. LEXIS 12424, at *2 (6th Cir. Nov. 7, 1983) ("[S]ection [2] only protects an employee's choice of a collective bargaining representative.").

Even were that not the case, even were we inclined to agree that Tulipana was a representative under § 2, Third, federal-court jurisdiction over actions filed under that section remains "extremely limited." *Wightman v. Springfield Terminal Ry.*, 100 F.3d 228, 234 (1st Cir. 1996). Some lower courts have recognized that even if a dispute arises in the representation, major or minor dispute setting, federal courts may theoretically have jurisdiction under § 2, Third and Fourth, if there is evidence of "carrier conduct reflecting anti-union animus, . . . discrimination, or coercion" or when "a carrier commit[ed] acts of intimidation that c[ould not] be remedied by administrative means, or commit[ed] a fundamental attack on the collective bargaining process or ma[de] a direct attempt to destroy a union." *Id.*; *see also Dempsey v. Atchison, Topeka & Santa Fe Ry.*, 16 F.3d 832, 841 (7th Cir. 1994) ("In situations such as ours, known as 'post-certification' controversies, Section 2, Fourth has been interpreted as providing protection where the plaintiff can show that the employer's actions strike a fundamental blow to union or employer activity and the collective bargaining process itself.") (quotation marks omitted); *Nat'l R.R. Passenger Corp. v. Int'l Ass'n of Machinists and Aerospace Workers*, 915 F.2d 43, 51 (1st Cir. 1990) ("[J]udicial intervention under Section 2 Third and Fourth is limited to circumstances where the employer's conduct has been motivated by anti-union animus or an attempt to interfere with its employees' choice of their collective bargaining representative or constitutes discrimination or coercion against that representative or involves acts of intimidation which cannot be remedied by administrative means.") (internal quotation marks and citation omitted); *Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 789 F.2d 139, 142 (2d Cir. 1986) (same); *Tello v. Soo Line R.R. Co.*, 772 F.2d 458, 462 (8th Cir. 1985) ("Tello does not raise a cognizable claim under 45 U.S.C. § 152 (Third) because he failed to present adequate evidence that Soo Line's actions have been motivated by anti-union animus or that Soo Line's actions were an attempt to interfere with its employees' choice of their collective bargaining representative."); *Local Union No. 2000, Int'l Bhd. of Teamsters v. Nw. Airlines*, 21 F. Supp. 2d 751, 756 (E.D. Mich. 1998). Notably, none of these courts found such jurisdiction to be appropriate in practice.

Even if we were to embrace this approach to post-certification disputes about representation, which we need not decide today, the union has not presented any evidence of anti-union animus, coercion or intimidation accompanying UPS's refusal to allow Tulipana to serve as Union Chair of the Louisville Safety Committee. In its letters, UPS consistently refers to the dispute as a contract dispute and repeatedly offers to deal with Tulipana in any other capacity. UPS requests only that the representative to the committee be a UPS employee, a requirement that it premises on the collective bargaining agreement. While the union refers to the dispute as an "attack on the union's fundamental right to select its own representative" and suggests that the acts of UPS are coercive, Union Br. at 25, it alleges no behavior, aside from UPS's simple refusal to allow Tulipana to serve, that substantiates those loaded phrases. Absent more concrete allegations of anti-union animus, the union cannot show that UPS's conduct has been sufficiently coercive to trigger any "extremely limited" jurisdiction under § 2, Third—even if that jurisdiction did extend beyond representatives appointed to handle collective bargaining on behalf of a union.

Attempting to dissuade us from this conclusion, the union argues that § 2, Third confers rights that are always judicially enforceable. But in support of this sweeping proposition, it again invokes *Texas & New Orleans Railroad*, 281 U.S. 548, a decision that (1) pre-dates the 1934 amendments to the Railway Labor Act, which gave exclusive jurisdiction over "minor disputes" involving railroads to the National Railroad Arbitration Board and (2) pre-dates the 1936 amendments to the Act, which extended similar jurisdiction to the system adjustment boards for airlines. *Texas & New Orleans Railroad* also involved a pre-certification dispute, which is to say a dispute that arose before the employees had chosen a union and which the Court's cases acknowledge deserves closer scrutiny than the post-certification dispute at issue here. *See Trans World Airlines*, 489 U.S. at 440. The union offers no explanation why we should ignore the path charted by other courts that have addressed this issue and why instead we should grant federal jurisdiction to post-certification "representation" disputes over the meaning of a collective

bargaining agreement, notwithstanding the existence of the system adjustment boards, which were established for this precise purpose. Because Congress has delegated exclusive jurisdiction over this dispute to the system adjustment boards, the district court correctly held that it lacked statutory jurisdiction to resolve the matter.

Neither does *Fennessy v. Southwest Airlines*, 91 F.3d 1359 (9th Cir. 1996), change matters. In that case, the court concluded that Fennessy's dispute was not a minor one, a factor that underlay the court's determination that there was federal jurisdiction over the claim. *Id*. at 1362. A more recent decision of the Ninth Circuit, *Ass'n of Flight Attendants v. Horizon Air Industries, Inc*., 280 F.3d 901, 905–06 (9th Cir. 2002), narrowed *Fennessy* to its facts, reasoning that it "involved a de facto precertification dispute," a setting that makes the precedent inapplicable here.

The union, lastly, argues that the district court erred when it failed to order an evidentiary hearing on the issues of material fact that the union claims remain unresolved in this case, namely whether it waived the right to have non-UPS employees sit on the safety boards and whether UPS has recognized Tulipana in any capacity. Because those fact questions come within the exclusive jurisdiction of the system adjustment boards, we agree with the district court's decision to deny the evidentiary hearing.

III.

For these reasons, we affirm.