NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0829n.06

No. 08-3932

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Dec 22, 2009**

LEONARD GREEN, Clerk

DALE EDWARD MICHAEL, JOHN R.
HASENAUER, ROY G. ARNOLD, and JIMMY D.
EUBANKS,

  Plaintiffs-Appellees,

v.

MALCOLM B. FUTHEY and JR., UNITED
TRANSPORTATION UNION,

  Defendants-Appellees,

and

JAMES M. BRUNKENHOEFER, ROY G.
BOLING, C.A. IANNONE, J.R. CUMBY, JOHN
W. BABLER, J.D. FITZGERALD, VICTOR
BAFFONI, and PAUL THOMPSON,

  Intervening Defendants-Appellants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE
NORTHERN DISTRICT OF
OHIO

**A M E N D E D  O P I N I O N**

BEFORE:  **CLAY and McKEAGUE, Circuit Judges; and HOLSCHUH, Senior District Judge.**[*]

  **McKEAGUE, Circuit Judge.** The panel issues three separate opinions but reaches one result.  Judges Clay and Holschuh would find that we have subject matter jurisdiction.  Judge Clay would uphold the preliminary injunction.  Judge Holschuh would not, and finds that the decision of

_____

[*]The Honorable John D. Holschuh, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

the district court granting the preliminary injunction should be reversed and, furthermore, that this action should be dismissed because there is absolutely no claims or evidence of any discrimination and no claim or evidence of any fraud or wrongdoing on the part of the union officials. Because I find that we do not have subject matter jurisdiction, I also would reverse the decision of the district court granting the preliminary injunction and dismiss the action. Consequently, the decision of this court is to reverse the decision of the district court granting the preliminary injunction and to dismiss the action.

Plaintiffs, members of a trade union, sued their union and its president in order to block a merger with another union. They argued that the merger process was flawed. The district court granted them a temporary restraining order and preliminary injunctive relief. Intervening union members have appealed, arguing that the district court abused its discretion in granting injunctive relief. They also argue that the district court did not have subject-matter jurisdiction. Because this case involves a dispute about which union properly represents Plaintiffs and because such disputes are within the sole jurisdiction of the National Mediation Board, we remand this case to the district court with instructions to dismiss for lack of subject-matter jurisdiction.

**I**

**A. Proposed Merger**

In 2004, Paul Thompson became president of the United Transportation Union ("UTU"), a labor union representing the operating employees of freight and passenger railways. Upon taking office, Thompson explored the possibility of merging the UTU with another labor union in an effort

to bolster its own bargaining strength and political influence. The UTU ultimately entered into negotiations with the Sheet Metal Workers International Association ("SMWIA"). In June 2007, Thompson introduced the finalized Merger Agreement between the UTU and the SMWIA at the UTU's regional meeting.

There, the UTU's Board of Directors listened to Thompson's presentation and voted to submit the Merger Agreement to the UTU membership for their approval in accordance with the UTU Constitution. On June 11, 2007, the UTU membership received an email that summarized the Merger Agreement. A more comprehensive mailing was subsequently sent to the UTU membership on July 17, 2007, and the voting period was to extend from that date until August 7, 2007. The mailing contained the Merger Agreement, supporting materials, and instructions for telephone and electronic voting.

In pertinent part, the Merger Agreement stated that the two entities—the UTU and the SMWIA—would together become the International Association of Sheet Metal, Air, Rail and Transportation Workers ("SMART") after the consummation of the merger. As to the governing document, the Agreement provided:

> SMART shall be governed by the SMART Constitution, which shall be the SMWIA Constitution amended to implement the provisions of this Agreement. This Merger Agreement is intended only to serve as a mechanism for integration of the two organizations and as a foundation for that Constitution. In the event of any conflict between any provision of this Merger Agreement and any provision of the SMART Constitution, the latter shall govern, and if any dispute should arise that cannot be resolved by the General President of SMWIA (and SMART) and the International President of the UTU (SMART President, Transportation Division), it shall be referred to arbitration as provided in Article XII.

ROA 98. For the SMWIA Constitution to become the SMART Constitution, the SMWIA's then-existing Article 21 was to be renumbered as Article 21A and the UTU Constitution was to become Article 21B "to the extent not in conflict with the current SMWIA Constitution or the terms of th[e] Agreement." ROA 105.

SMART would be governed by officers from both of the former unions. The Agreement also proposed the creation of a Transportation Division within SMART that would be governed by the UTU officers elected at the UTU convention.

The Merger Agreement provided that along with the Merger Agreement, the SMART Constitution had to be approved by the UTU membership. In addition, the UTU Constitution required that the membership be provided with copies, by mail, of any agreements or merger documents that they were asked to ratify in a referendum. Neither the UTU Constitution nor the SMWIA Constitution was included in the mailing sent to the UTU members, although both were posted on the UTU's website throughout the voting period. A finalized version of the SMART Constitution, while referred to in the Merger Agreement, was not provided to the UTU membership before the merger was approved. Of the UTU's 68,000 members, 8,625 voted in favor of the merger and 3,472 voted against it.

From August 13 to August 17, 2007, the UTU held its quadrennial convention, when international UTU officers were elected and amendments to the UTU Constitution were considered. Because the convention took place after the voting period for the merger had ended, the extent of any conflicts between the UTU and SMWIA Constitutions could not be fully known at the time of the vote. Ultimately, the UTU membership approved two amendments to the UTU Constitution: one

requiring the general secretary and treasurer to submit his office's annual budget to the president and the other increasing benefits for striking union members.

The UTU's elections process was changed from the way it had been conducted in prior years.

*Michael v. Thompson*, No. 1:07-cv-3818, 2008 WL 4593984, at *3-4 (N.D. Ohio Oct. 15, 2008).

As explained on the UTU's website:

> The UTU now has 20 international officers. Will these officers keep their jobs under new names when the UTU-SMWIA merger is implemented on Jan. 1, 2008?
>
> No. Ten international officer positions will be eliminated. The UTU now has 15 international vice presidents, a U.S. national legislative director, a Canadian legislative director, a president, an assistant president, and a general secretary and treasurer (20 full-time international officers). Effective Jan. 1, 2008, six vice president positions will be immediately eliminated. In addition, the assistant president, general secretary and treasurer and two additional vice president positions will be abolished between 2008 and the first SMART International Convention in 2011.

ROA 1511. Accordingly, only nine international vice presidents[1] were elected at the UTU's quadrennial convention, rather than the fifteen who were elected in the past. Additionally, besides electing numerous alternate officers, the UTU membership chose a new president, assistant president, general secretary and treasurer, and national legislative director. In the event that the merger was effectuated, those officers would become vice presidents of SMART.

**B.      Lawsuit**

---

[1]The September 2007, issue of the "UTU News" announced that ten international vice presidents were elected at the quadrennial convention. This number presumably includes Glenn J. King, who was elected "International vice president/Canadian legislative director." The position of Canadian legislative director is accounted for separately in the merger materials, and King's official position would apparently not be affected by the merger's elimination of six vice-president positions.

On December 3, 2007, Plaintiffs Dale Edward Michael, John R. Hasenauer, Roy G. Arnold, and Jimmy D. Eubanks filed suit against Thompson and the UTU in the Southern District of Illinois. Plaintiffs sought declaratory and emergency injunctive relief, claiming that the pending merger with the SMWIA was unlawful because the UTU membership was not given sufficient information with which to evaluate the implications of the merger. Thompson and the UTU filed a motion to dismiss for improper venue. The district court found that venue was improper and transferred the case to the Northern District of Ohio, where the UTU is headquartered.

Thompson and the UTU defended against Plaintiffs' claims, filing oppositions to Plaintiffs' motions for a TRO and a preliminary injunction. The district court held a hearing on December 27, 2007, on the TRO motion, which it granted. Shortly after the hearing, on January 3, 2008, Plaintiffs moved for summary judgment, which they later agreed the district court could hold in abeyance pending the outcome of discussions between the parties.

Since that time, the officers who were elected at the August UTU convention have taken office, and Thompson has been succeeded as president by Malcolm Futhey. Plaintiffs sought to substitute Futhey for Thompson as a defendant. Futhey had previously submitted a declaration on behalf of Plaintiffs in their motion for a preliminary injunction and had expressed opposition to Thompson's method of promoting the merger and proceeding to a vote on the issue. Upon Plaintiffs' motion to substitute Futhey, several officers of the UTU who supported the merger moved to intervene in the case because they were concerned that Futhey would not defend against Plaintiffs' claims.

Prior to the district court's ruling on the motion to intervene, Plaintiffs and the current

Defendants (Futhey and the UTU) agreed to attempt to produce a SMART Constitution so that a new vote could be taken among the membership. This agreement was set forth in terms of an extension of the TRO, which amounted to an agreement not to go forward with the merger until the parties had been able to discuss the issues in the case. The parties agreed that this period would last until February 13, 2008. On February 1, 2008, the district court granted Plaintiffs' motion to substitute and held a telephone conference with the parties and the proposed Intervenors, at which time Plaintiffs and Defendants again agreed to forestall the consummation of the merger pending a discovery period on the motion to intervene.

The district court held an evidentiary hearing on the motion to intervene on May 28, 2008, at which time the proposed Intervenors presented testimony and Plaintiffs and Defendants cross-examined the witnesses. On June 18, 2008, the district court granted the motion as to all of the current UTU office-holders, but denied the motion as to Thompson.

## C.     Intervenors' Motion to Dismiss for Lack of Subject-Matter Jurisdiction

Previously, on January 30, 2008, the proposed Intervenors had filed a motion to dismiss for lack of subject-matter jurisdiction. As the proposed Intervenors had not yet been granted intervenor status, the district court denied the motion, but did so without prejudice so that the motion could be renewed if the request to intervene was subsequently granted. The proposed Intervenors appealed, asking this court to stay the TRO and to issue a writ of mandamus directing the district court to dismiss for lack of jurisdiction. The court denied the motion to stay and the petition for a writ of mandamus, noting that the jurisdictional issue could be reviewed in the event of a future appeal. On

remand and after it granted them intervenor status, the district court denied Intervenors' motion to dismiss. *Thompson*, 2008 WL 4593984, at *1.

**D.     Plaintiffs' Motion for a Preliminary Injunction**

On June 26, 2008, the district court granted Plaintiffs' motion for a preliminary injunction, which enjoined the UTU and the SMWIA from consummating the merger in accordance with the Merger Agreement. In weighing the likelihood of success, the district court noted the UTU's failure to submit the SMART Constitution to its membership before asking them to vote. The district court found that this effectively deprived members of a meaningful vote, as required by the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. § 411(a)(1), because the relevant terms of the proposed merger were not fully known to them. The district court further found that the remaining factors weighed in favor of preliminary injunctive relief.

Intervenors appealed.

**II**

On appeal, Intervenors take issue with the district court's preliminary injunction as well as its finding that it had subject-matter jurisdiction. We begin our analysis by considering the threshold question of jurisdiction. *Schultz v. Gen. R.V. Ctr.*, 512 F.3d 754, 756 (6th Cir. 2008).[2]

---

[2]I note that both of the other opinions would find that this court has jurisdiction. Judge Holschuh's concurrence argues that § 101(a)(1) of the LMRDA should be read to only require an equal, as opposed to a meaningful, vote. However, were I to reach the merits of this case, I do not believe that his reading of *Blanchard* is consistent with that decision's requirement that there be sufficient information to permit a meaningful vote. It is a longstanding rule in the Sixth Circuit that "[a] panel

Intervenors contend that Plaintiffs' complaint raises a "representation dispute" under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq. The National Mediation Board ("Board") has exclusive jurisdiction over representation disputes and, therefore, Intervenors argue that the court does not have subject-matter jurisdiction. Although the matter was raised before the district court in the brief opposing the request for a TRO and during the subsequent hearing, the district court did not directly address this jurisdictional issue.[3]

The RLA covers air and rail carriers engaged in interstate or foreign commerce and the carriers' employees. 45 U.S.C. §§ 151, 181. The act is "a unique blend of moral and legal duties looking toward settlement through conciliation, mediation, voluntary arbitration, presidential intervention, and finally, in case of ultimate failure of the statutory machinery, resort to traditional self-help measures." *Chicago & N. W. Ry. v. United Trans. Union*, 402 U.S. 570, 589 (1971) (Brennan, J., dissenting). The act was designed to "avoid any interruption to commerce or to the

---

of this Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Dingle v. Bioport Corp.*, 388 F.3d 209, 215 (6th Cir. 2004) (quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985)). *Blanchard* required that sufficient information must be disclosed for there to be a meaningful vote, and it was not an abuse of discretion for the district court to conclude, in the process of granting the preliminary injunction, that the Plaintiffs had shown a substantial likelihood of success on their claim that they were deprived of a meaningful vote on the merger referendum.
[3]Intervenors also argue on appeal that the preliminary injunction had the effect of undoing a completed officer election, implicating Title IV of LMRDA. 29 U.S.C. §§ 481-483. Because Title IV requires that a federal suit seeking to enforce that title's protections be initiated by the Secretary of Labor, the Secretary's absence from this lawsuit means that the court lacks jurisdiction, according to Intervenors. Because we find that the lawsuit must be dismissed under the RLA, *see infra*, we do not reach Intervenors' alternate jurisdictional argument.

operation of any carrier engaged therein" caused by labor-management disputes. 45 U.S.C. § 151a(1).

Plaintiffs argue that their dispute is not subject to the RLA because the SMWIA is predominately a construction union and a "significant minority" of UTU members are bus drivers employed by private companies and public schools, not employees of covered carriers. This argument was not, however, developed in Plaintiffs' briefs, but rather was raised in a footnote in their primary brief and in a short paragraph in a letter brief submitted after oral argument. *See* Plaintiffs-Appellees' Br. at 46 n.21; Apr. 23, 2009, Letter. It is well-settled that a party waives any issue that is "'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation.'" *Langley v. DaimlerChrysler Corp.*, 502 F.3d 475, 483 (6th Cir. 2007) (quoting *Indeck Energy Servs. v. Consumers Energy*, 250 F.3d 972, 979 (6th Cir. 2000)).

In any event, it is undisputed that the UTU has traditionally been considered a railway-labor organization. *See, e.g.*, *United Transp. Union v. Gateway W. Ry. Co.*, 78 F.3d 1208, 1210 (7th Cir. 1996) (noting that the UTU represented train-service employees and was subject to the RLA). Plaintiffs admit that the majority of UTU members are covered employees. A dispute involving a labor organization composed predominately of covered employees will not fall outside the RLA's coverage simply because a minority of the organization's members are not covered employees. *Air Line Pilots Ass'n v. NLRB*, 525 F.3d 862, 870 (9th Cir. 2008). The makeup of the SMWIA's membership is beside the point. Resolution of the parties' dispute will determine whether the current members of the UTU remain members of that union or instead become members of a new union. It is the current membership of the UTU, not the membership of the SMWIA, that is at issue here.

The RLA divides labor disputes into four categories: representation disputes, major disputes, minor disputes, and collateral disputes governed by independent state or federal laws. *Int'l Bhd. of Teamsters v. UPS Co.*, 447 F.3d 491, 495 (6th Cir. 2006). Representation disputes involve the right of the "majority of any craft or class of employees" to "determine who shall be the representative of the craft or class for the purposes" of the RLA. 45 U.S.C. § 152, *Fourth*. These disputes center on "defining the bargaining unit and determining the employee representative for collective bargaining." *W. Airlines, Inc. v. Int'l Bhd. of Teamsters*, 480 U.S. 1301, 1302 (1987) (O'Connor, J., granting application for stay).

> Section 2, *Ninth* of the RLA governs resolution of representation disputes:
>
> If any dispute shall arise among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of this chapter, it shall be the duty of the Mediation Board, upon request of either party to the dispute, to investigate such dispute and to certify to both parties, in writing, within thirty days after the receipt of the invocation of its services, the name or names of the individuals or organizations that have been designated and authorized to represent the employees involved in the dispute, and certify the same to the carrier.

45 U.S.C. § 152. This provision "gives the Mediation Board the power to resolve controversies concerning it and as an incident thereto to determine what is the appropriate craft or class in which the election should be held." *Switchmen's Union of N. Am. v. NMB*, 320 U.S. 297, 301 (1943) (discussing 45 U.S.C. § 152, *Ninth*). The Board's jurisdiction to resolve representation disputes is exclusive. *Gen. Comm. v. Missouri-Kansas-Texas R.R. Co.*, 320 U.S. 323, 336 (1943). Thus, if "a complaint alleges what is properly characterized as a representation dispute, the district court must dismiss the case for lack of subject matter jurisdiction." *United Transp. Union*, 78 F.3d at 1213.

A federal court "may not . . . grant injunctive relief to maintain the status quo, because to do so would necessarily have the effect, at least during the period of the injunction, of deciding the representation issue." *Id.* (internal quotation marks omitted). The decision of the Board is final and not reviewable in federal court. *Int'l Bhd. of Teamsters*, 447 F.3d at 497.

Major disputes occur after certification "over the formation of collective agreements or efforts to secure them" and "arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past." *Elgin, Joliet & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945). Minor disputes contemplate "the existence of a collective agreement." *Id.* They relate "either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Id*. Finally, disputes over rights granted by other provisions of federal and state law, which are not otherwise covered by any of the previous dispute categories, are largely unaffected by the RLA. *Hawaiian Airlines v. Norris*, 512 U.S. 246, 260 (1994) ("[A] state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the CBA.").

Plaintiffs' claims do not fall within either the major-dispute or the minor-dispute category. Thus, we are left to consider whether Plaintiffs' claims raise a representation dispute or a dispute governed by other federal law, specifically the LMRDA. We begin with the text of the statute. The parties' dispute fits neatly within the representation-dispute language of the RLA: theirs is a "dispute . . . among" covered employees concerning "who are the representatives of such employees." 45

U.S.C. § 152, *Ninth*. Under the primary canon of statutory construction, we "must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461-62 (2002) (quotation marks and citation omitted).

The dissent bypasses the text of Section 2, *Ninth* in concluding that the parties' dispute is not a representational one under the RLA. We have no doubt that the dissent is correct that the RLA covers labor-management disputes between union members on one side and covered employers on the other, *see* Dis. at 1-3, but that is not the issue—rather, the issue is whether the RLA is exclusively *limited* to such disputes. The statute itself is not so narrowly drawn and in fact would seem to cover the types of dispute at issue in this case more readily than those highlighted by the dissent, as the text explicitly states that the RLA covers disputes "among" employees but fails to mention disputes between an employee group and a carrier. Neither the dissent nor Plaintiffs have pointed to any legislative history or judicial decision that persuasively shows that Congress intended the type of narrow construction of Section 2, *Ninth* adopted by the dissent, and our own research has likewise come up empty. (That labor-management disputes can readily take the form of employee-employee disputes may explain why Congress did not so limit the reach of the RLA.)

Moreover, when faced with similar questions, other courts have given the benefit of the doubt to finding a representation dispute. "[W]hen the precise character of the dispute is in doubt (when the dispute, in other words, is only 'arguably' representational), a federal court should not proceed, for the NMB has primary jurisdiction to determine whether it has exclusive jurisdiction over the dispute.'" *United Transp. Union*, 78 F.3d at 1213-14 (quoting *United Transp. Union v. United*

*States*, 987 F.2d 784, 789 (D.C. Cir. 1993)); *see also Air Line Pilots Ass'n v. Tex. Int'l Airlines, Inc.*, 656 F.2d 16, 24 (2d Cir. 1981) (concluding that the court had no jurisdiction over lawsuit even though the question whether the dispute was a representation one was "murky"); *Int'l Ass'n of Machinists v. Ne. Airlines*, 536 F.2d 975, 977 (1st Cir. 1976). In resolving whether a complaint involves a representation dispute, we are to "pierce[] the technical issues of pleading" and consider the substance of the allegations. *Bhd. of Locomotive Firemen & Enginemen v. Louisville & Nashville R.R. Co.*, 400 F.2d 572, 575 (6th Cir. 1968).

Plaintiffs argue that the Board treats a dispute over the validity of a merger as an internal union matter outside the reach of its jurisdiction under Section 2, *Ninth*. This goes too far. While it is true that the Board has routinely referred to merger disputes as internal-union matters, the Board has, in fact, reviewed claims in several actions attacking the validity of mergers and elections. For example, in *Northwest Airlines*, 18 N.M.B. 446, 1991 WL 519551 (1991), a majority of members of the Northwest Airlines Foremen's Association voted in favor of merging with another union. The Board was asked to transfer the certification held by the Foremen's union to the other union. The Board received complaints from two foremen about the polling procedures used by the Foremen's union in connection with the merger vote. The Board investigated the polling procedures; following its investigation, the Board determined that a transfer of certification was proper:

> The Board views an organization's decision to merge into another organization as an internal matter and will grant requests for transfers of certification based on union mergers *unless* it discovers evidence of *fraud or gross abuse* in the merger process. . . . In the course of its investigation the Board found neither allegations nor evidence of fraud or gross abuse in the merger process. . . . Based on its investigation, the National Mediation Board hereby finds that Northwest Airlines Foremen's Association has merged into Transport Workers Union of America.

*Id.* at 448-49 (emphasis added). The Board has similarly reviewed merger and election processes for fraud or gross abuse in other actions. *See, e.g.*, *Re: AirTrain Airways*, 36 N.M.B. 114, 115-16, 2009 WL 1430352, at *1-2 (2009) (reviewing merger and election processes for "fraud or gross abuse"); *Re: Evergreen Int'l Airlines, Inc.*, 35 N.M.B. 11, 12-13, 2007 WL 4125523, at *2 (2007) (same); *Capital Cargo Int'l Airlines, Inc.*, 34 N.M.B. 190, 2007 WL 2153286 (2007) (same); *Re: Consol. Rail Corp./FOP, NLC-Conrail 1/UTU*, 29 N.M.B. 265, 2002 WL 533476 (2002) (same); *see also Cont'l Airlines, Inc. v. NMB*, 793 F. Supp. 330, 332 (D.D.C. 1991) ("[T]he RLA does not prohibit the Board from investigating the circumstances of a union merger ratification vote and granting a transfer of certifications based on that vote *if the circumstances warrant*." (emphasis added)).

The Fifth Circuit was faced with a question almost identical to the one present here. In *Minjares v. Independent Association of Continental Pilots*, 293 F.3d 895 (5th Cir. 2002), several members of a pilots' union sued to block a vote on the proposed merger of their union with another union. The proposed merger had been approved by the board of directors, but just days before members were to begin voting, the plaintiffs filed suit claiming, among other things, that the proposed merger violated their union's constitution. The district court held an expedited bench trial and found against the plaintiffs.

On appeal, the Fifth Circuit did not reach the merits of the plaintiffs' claims. Instead, the court found that the plaintiffs' suit involved a representation dispute and the district court did not have jurisdiction to resolve the dispute. The court did so even after the Board had earlier concluded

that its "precedent establishes that an organization's decision to merge into another organization as an internal union matter. Therefore, the merger process has no relationship to the RLA representation process." *Re: Indep. Ass'n of Cont'l Pilots/Air Line Pilots Ass'n*, 28 N.M.B. 473, 483-84, 2001 WL 812219, at *5 (2001). In finding a lack of jurisdiction, the Fifth Circuit explained:

> In *Int'l Ass'n of Machinists & Aerospace Workers v. Northeast Airlines, Inc.*, the plaintiff union had been the representative of certain Northeast Airlines employees prior to a merger with Delta. 536 F.2d 975, 976 (1st Cir. 1976). The union sued Delta, claiming that Delta's failure to bargain violated its substantive duties under the RLA. In affirming the dismissal of the complaint, the court stated that "at the very least, the merger created real doubts about whether plaintiffs represent the majority of any Delta craft or class of employees, and where there is such doubt, federal courts leave resolution of the dispute to the National Mediation Board." *Id.* at 977.
>
> We recognize that, unlike the issue presented in *Int'l Ass'n of Machinists,* a union's decision to merge into another union could be viewed as a purely internal union matter, having no relationship to the RLA process. However, the practical effect of our interfering with the merger would be a court imposed decision effectively deciding who represents the Pilots. This fact, together with the historically limited role of the courts in enforcing the RLA, leads us to conclude that the RLA "affords the sole and mandatory means for resolving" the dispute. *See Summit Airlines, Inc. v. Teamsters Local Union No. 295*, 628 F.2d 787, 793 (2d Cir. 1980). Because we conclude that the courts lack jurisdiction over this matter, we do not reach the merits of Independent's argument regarding the merger.

*Minjares*, 293 F.3d at 898-99.

While not binding in this circuit, we agree with the reasoning of the Fifth Circuit in *Minjares* and find it applicable to Plaintiffs' dispute. Plaintiffs asserted in their complaint that this was not a merger, "but rather an acquisition of the UTU by the Sheet Metal Workers." ROA 27. They asked the district court to find that the Merger Agreement was "null and void" and to enjoin the consummation of the merger. ROA 30-31. Plaintiffs asserted that because of an improper merger vote, the UTU (and not SMART) continued to represent them. These and other assertions by

Plaintiffs focus the dispute on what organization represents the covered employees. By granting Plaintiffs' request for preliminary injunctive relief, the district court determined as a practical matter that Plaintiffs and their fellow members will continue to be represented by UTU, rather than SMART, at least during the pendency of this lawsuit. That was, after all, the entire point of the injunctive relief—to keep the eggs unscrambled, so to speak.

Here again, we are puzzled by an assertion of the dissent. To buttress the proposition that labor-management negotiations will not be affected by the proposed merger, the dissent asserts, "[E]ven if the merger goes forward, under the terms of the Merger Agreement, the UTU's elected officials will continue to represent their employees in transportation industry disputes." is. at 3. As we explained above, the RLA is not exclusively limited to labor-management disputes. Setting that aside, the dissent's observation adds little to the force of the analysis. All parties agree that the "UTU" will cease to exist as an independent union if the merger goes forward—that is the purpose and effect of the merger. Under the Merger Agreement, the UTU would become a division of the new SMART union and the UTU's Constitution would continue to exist *but only* "to the extent not in conflict with the current SMWIA Constitution or the terms of th[e] Agreement." ROA 105. It is not unreasonable to believe that officers of an independent union will behave much differently than officers of a division of a much larger union during labor-management negotiations, ceteris paribus.

Plaintiffs argue that their dispute is not one grounded in representation, but rather the rights guaranteed to union members under Title I of the LMRDA. Included among those rights is the right to an informed vote on union referendums. *See* 29 U.S.C. §§ 411(a)(1), 414. They point out that they

- 17 -

are unaware of any action in which the Board asserted jurisdiction to resolve issues arising under Title I of the LMRDA.

While Plaintiffs may be correct that they raise a Title I claim, it is inescapable that they also raise allegations and seek relief related to a representation dispute. Even when a lawsuit raises non-representation matters, a court will not have subject-matter jurisdiction over that lawsuit if the suit also involves a representation dispute. *Switchmen's Union*, 320 U.S. at 303; *Air Line Employees Ass'n, Int'l v. Republic Airlines, Inc.*, 798 F.2d 967, 968 (7th Cir. 1986) ("A court may not entertain an action involving [a representation] dispute even if it arises in the context of otherwise justiciable claims."). Plaintiffs have not shown how their Title I claim can be meaningfully separated from the representation dispute they have raised.

Finally, Plaintiffs maintain that the Board does not have jurisdiction to hear this case in its present form because the merger has not yet become effective. We note that the lawsuit in *Minjares* was filed prior to the merger vote even taking place. *Minjares*, 293 F.3d at 896-97. Putting aside the fact that the merger has not become effective *as a direct result of* the injunctive relief requested by Plaintiffs, if whether a cause of action involved a representation dispute hinged critically on the effective date of the merger, then the Board's jurisdiction could always be circumvented by filing suit before the effective date. That type of gamesmanship cannot be used as a means of conjuring subject-matter jurisdiction in federal court.

Had the merger been allowed to become effective, the UTU and SMWIA would have joined to become SMART. The Board could have then been requested to transfer UTU's certification to SMART and, in that proceeding, concerns about the merger vote could have been raised. Based on

*Northwest Airlines* and similar Board decisions, it is clear that the Board would have reviewed the merger process for fraud or gross abuse.

**III**

For the reasons set forth above, we find that Plaintiffs' lawsuit raises a representation dispute. The Board has primary jurisdiction to determine whether it has exclusive jurisdiction over the parties' dispute. Accordingly, the district court should not have proceeded to grant preliminary injunctive relief to Plaintiffs but, rather, should have granted Intervenors' motion to dismiss for lack of jurisdiction. The case is **REMANDED** to the district court for **DISMISSAL** consistent with this opinion.

**AMENDED DISSENT**

**CLAY, Circuit Judge, dissenting.** I would uphold the district court's preliminary injunction. The district court had jurisdiction under the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), 29 U.S.C. §§ 401 *et seq.*, to hear the parties' dispute, and the court did not abuse its discretion in granting the preliminary injunction against the UTU. I therefore respectfully dissent.

The grant of the petition for rehearing has raised some additional issues that I should address before reaching the merits of the case. I agree that the petition for rehearing should have been granted, but for the purpose of vacating our previous opinions and assigning the case to a different panel. I do not agree with the addition of the first paragraph to the lead opinion which does nothing but recite what was already said in the opinions and makes the misleading assertion that the three opinions reach "one result." The three separate opinions, relying on different rationales, fail to provide proper guidance to either these litigants or future litigants on the important issues of labor law before the Court.

The problems raised by Plaintiffs and Defendants in their joint petition for rehearing are not addressed or resolved by the language added to the lead opinion in response to the petition for rehearing. The parties understood the anomalous result created by our three divergent opinions but, like me, were troubled by the confusion created by the three opinions as well as the likely collateral consequences of that result. Plaintiffs have no venue to pursue their claim, a claim that two judges

- 20 -

of this court felt had merit.[1] This anomalous result was reached because the concurring opinion by Judge Holschuh, at best, incorrectly reads existing circuit precedent extremely narrowly. Furthermore, the concurring opinion recommends dismissal of the entire suit without considering Plaintiffs' claims under the LMRA, 29 U.S.C. § 185, and Section 101(a)(2) of the LMRDA.

The differing rationales offered by each member of the panel continue to create a somewhat incongruous result. In this case, we have two separate issues: jurisdiction and the propriety of entering the preliminary injunction. Although Judge McKeague instructs the district court to dismiss for lack of jurisdiction, dismissal by the district court on that basis would be inappropriate because a majority of the panel (Judges Clay and Holschuh) has decided that jurisdiction is proper. While two of the opinions believe jurisdiction is proper, they diverge on whether to uphold the district court's injunction. The third opinion takes the position that there is no jurisdiction to provide a basis for entering an injunction, but that opinion seems to imply that it might favor entering an injunction if the court could have addressed the merits.

In light of the competing rationales and potential for confusion, I believe the panel should have vacated our opinions upon granting the motion for rehearing and reassigned the case to another panel, in the hope that another panel might be capable of producing a two-judge majority. Judge

---

[1] Judge Holschuh misconstrues this argument. I do not allege, as he asserts, that two judges of this court do not believe that Plaintiffs have no venue to pursue their claim; to the contrary, it is apparent that both I and Judge Holschuh believe this Court has jurisdiction. I am referencing the fact that the petition for rehearing states that the National Mediation Board has specifically disavowed jurisdiction over this type of claim. Therefore, Plaintiffs have no further avenue for relief. This result is troubling when two judges of this Court (Clay and McKeague) believe Plaintiffs have shown a likelihood of success on the merits. It is an unfortunate result that Plaintiffs successfully convinced a majority of this panel that they are entitled to relief but are unable to find an avenue to pursue that relief.

Holschuh makes much of his contention that there is no precedent for reassigning the case to another panel. He completely misapprehends my position. I am not suggesting that we are required to reassign the case as a matter of law. In the interest of justice, the panel could certainly exercise its discretion to vacate its opinions and order reassignment pursuant to the petition for rehearing. I simply believe that reassignment would be a prudent measure the panel could take to diminish the confusion created by our three opinions, in the hope that another panel could reach a decision of greater coherence and clarity than our panel has been able to achieve in order to aid the parties and advance the Court's jurisprudence.

## I.       Jurisdiction

### A.       RLA

The lead opinion would dismiss the suit for lack of jurisdiction, finding that the dispute is a "representation dispute" under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 *et seq.*, and that the National Mediation Board (the "NMB") therefore has exclusive jurisdiction to hear Plaintiffs' cause. The lead opinion's view that a representation dispute includes disputes between union members over the validity of the union's merger vote is misguided for several reasons.

First, Congress clearly did not intend the RLA's resolution procedures for representation disputes to apply to an internal union dispute over the validity of its merger vote. A "representation dispute" is described in the statute as a dispute "among a carrier's employees as to who are the representatives of such employees designated and authorized in accordance with the requirements of [the RLA]." 45 U.S.C. § 152, *Ninth*. Although the words "among a carrier's employees," taken

out of context, could be read to imply that representation disputes include internal union disputes, both the statutory context and the legislative history of § 152, *Ninth* undermine such a reading.

Congress intended the RLA to address disputes between union members *and their employers*. *See Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 252 (1994) ("Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes."); *Union Pac. R.R. Co. v. Sheehan*, 439 U.S. 89, 94 (1978) ("In enacting [the RLA], Congress endeavored to promote stability in labor-management relations . . . by providing effective and efficient remedies for the resolution of railroad-employee disputes arising out of the interpretation of collective-bargaining agreements."); s*ee also* 45 U.S.C. § 151a (setting forth statute's five purposes, all of which concern labor-management relations). Undeniably, no such dispute between union members and their employer is present here.

The Supreme Court recognized in *Virginia Ry. Co. v. System Fed'n No. 40*, 300 U.S. 515 (1937) that a representation dispute is part of the general discord between labor and management that Congress sought to ameliorate in passing the RLA. Examining the legislative history of § 152, *Ninth*, the Court stated:

> Experience had shown, before [the enactment of § 152, *Ninth*], that when there was no dispute as to the organizations authorized to represent the employees, and when there was willingness of the employer to meet such representative for a discussion of their grievances, amicable adjustment of differences had generally followed and strikes had been avoided. On the other hand, a prolific source of dispute had been the maintenance by the railroads of company unions and the denial by railway management of the authority of representatives chosen by their employees. Section [152, *Ninth*] was specifically aimed at this practice.

*Virginia Ry. Co.*, 300 U.S. at 545-46 (citations and footnotes omitted). The Supreme Court made clear that the purpose of § 152, *Ninth* was to prevent an employer from dictating the specific union, or union officers, with whom it would be willing to negotiate. The plain language of the statute confirms this goal. *See* 45 U.S.C. § 152, *Ninth* (authorizing NMB to resolve representation disputes "in such manner as shall insure the choice of representatives by the employees without interference, influence or coercion *exercised by the carrier*") (emphasis added). The statute also explains that as a result of seeking certification from the NMB as to the identity of the employees' representative, "*the carrier* shall treat with the representative so certified as the representative of the craft or class for the purposes of this chapter." 45 U.S.C. § 152, *Ninth* (emphasis added). Thus, both the statutory language and long-established Supreme Court precedent dictate that § 152, *Ninth* was simply meant to be another means by which organized labor could counter manipulative tactics by employers negotiating collective bargaining agreements with their employees.

The dispute in the instant case does not concern an employer's denial of a labor representative's claims of bargaining authority. Neither party makes any reference to–let alone submits evidence of–any employer's position with respect to this dispute, or to the existence of any collective bargaining agreement which gave rise to the dispute. *See Hawaiian Airlines*, 512 U.S. at 260 ("[A] state-law cause of action is not pre-empted by the RLA if it involves rights and obligations that exist independent of the CBA[.]"). In fact, there is no evidence that the merger vote will have any impact on the entities with which the union members' employers must negotiate in future disputes, because even if the merger goes forward, under the terms of the Merger Agreement, the

UTU's elected officers will continue to represent their employees in transportation industry disputes.[2]

Second, as the lead opinion appears to recognize, the LMRDA expressly grants authority for federal courts to hear this type of claim. Congress enacted the LMRDA "to eliminate or prevent improper practices on the part of labor organizations, employers, labor relations consultants, and their officers and representatives[.]" 29 U.S.C. § 401(c). Title I of the LMRDA, §§ 411-15, guarantees each union member an equal right to participate in union elections, meetings and referenda. Specifically, under § 411(a)(1) of the LMRDA, "[e]very member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws." The Supreme Court has interpreted § 411(a)(1) as "a command that members and classes of members shall not be discriminated against" with respect to the rights specified. *Calhoon v. Harvey*, 379 U.S. 134, 139 (1964). This Court has interpreted union members' right to take part in nondiscriminatory union voting under Title I to include "the right of a meaningful vote[.]" *Sertic v. Cuyahoga, Lake, Geauga and Ashtabula Counties Carpenters Dist. Council*, 423 F.2d 515, 521 (6th Cir. 1970). Thus, when a union membership votes on a proposal offered by its leadership, § 411(a)(1) requires the union leadership

---

[2]Intervenors seek to have it both ways. On the one hand, they argue that it was unnecessary for UTU members to examine the SMWIA constitution before voting, because UTU members' rights and representation would not be substantively affected by the merger. Yet here, they argue that the merger would affect the identity of UTU members' representation, and therefore, the dispute should be reserved for the NMB.

to provide "sufficient information . . . to allow a reasoned and informed vote on the proposal which appears on the ballot." *Blanchard v. Johnson*, 532 F.2d 1074, 1079 (6th Cir. 1976). Union members alleging violations of Title I may file suit against their union in federal district court. 29 U.S.C. § 412.

Plaintiffs allege violations of Title I in their complaint, both expressly identifying Title I of the LMRDA as the relevant statute and alleging facts that, if true, would certainly give rise to a claim under Title I–i.e., that the UTU's members did not cast meaningful votes on the referendum concerning the merger. Thus, the subject matter of this dispute is one that Congress expressly intended this Court to hear.

Arguably, the LMRDA is not the only federal statute that confers authority on federal courts to resolve challenges to the fairness of union merger votes. Another statute, the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, provides that "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, *or between any such labor organizations*, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a) (emphasis added). "A union constitution is a contract between labor organizations under [§ 185(a)]." *Millwright Local No. 1079 v. United Bhd. of Carpenters and Joiners of Am.*, 878 F.2d 960, 962 n.4 (6th Cir. 1989). Accordingly, this Court has routinely exercised jurisdiction pursuant to the LMRA over internal union disputes concerning the validity of votes conducted pursuant to union constitutions. *See, e.,g., Millwright*, 878 F.2d at 962-64 (considering merits of challenge to merger between two local union

branches based on alleged denial of members' right to vote under their constitution). Given that Congress authorized the federal courts to resolve disputes such as the instant one in multiple statutes, the lead opinion's exclusive reservation of the issue in this case to the NMB is particularly inappropriate.

The lead opinion concedes that "Plaintiffs may be correct that they raise a Title I [LMRDA] claim," but nevertheless dismisses the claim as strictly reserved for the NMB because "it is inescapable that [Plaintiffs] also raise allegations and seek relief related to a representation dispute." Lead Op. at 17. Yet if an internal union dispute over the validity of its merger vote falls within the exclusive jurisdiction of the NMB, and also constitutes a cognizable federal claim under the LMRDA, then the RLA and LMRDA would seem to be in conflict and the LMRDA, as the later-enacted statute, would trump the exclusivity provision of the RLA. *See Lockhart v. United States*, 546 U.S. 142, 149 (2005) ("When the plain import of a later statute directly conflicts with an earlier statute, the later enactment governs[.]"). Of course, the two statutes are easily reconcilable if § 152, *Ninth* is read not to cover internal union disputes over merger votes, and the RLA and the LMRDA should be read to avoid the kind of tension the lead opinion creates. The Supreme Court similarly avoided reading a conflict between the RLA and another federal statute in *Atchison, Topeka and Santa Fe Ry. Co. v. Buell*, 480 U.S. 557 (1987), in which the plaintiff, a railroad worker alleging workplace injuries, brought suit under a federal statute providing a cause of action for railroad workers injured due to their employers' negligence. The railroad company tried to argue that the plaintiff's suit was also a "minor dispute" under the RLA, and that minor disputes were the exclusive jurisdiction of one of two federal arbitration boards. *Id.* at 563. The Supreme Court rejected the

defendant's argument, reasoning that because Congress specifically enacted the railroad negligence statute to remedy the type of injury alleged in this case, defendants were advocating an implicit repeal of the railroad negligence statute without basis. *Id.* at 566. We should reject Intervenors' RLA argument here for the same reason.

As the foregoing analysis makes clear, the lead opinion's assertion that "[t]he dissent bypasses the text of [§ 152], *Ninth* in concluding that the parties' dispute is not a representational one under the RLA[,]" Lead Op. at 12, is entirely misplaced. While the text of § 152, *Ninth could* encompass a dispute over a union merger, nothing in the statute requires such a reading, and therefore, the key question is whether another statute grants federal jurisdiction over this kind of dispute; if so, then the dispute cannot be representational, or § 152, *Ninth* would contradict the other statute's conferral of federal jurisdiction. The lead opinion plainly recognizes this, stating that "we are left to consider whether Plaintiffs' claims raise a representational dispute *or a dispute governed by other federal law, specifically the LMRDA*." Lead Op. at 12 (emphasis added). Despite recognizing this dichotomy, the lead opinion never follows through on its duty to consider the applicability of the LMRDA–and with good reason, since the lead opinion would have a difficult time explaining how LMRDA Title I does not apply. In short, the lead opinion is wrong to require proof that § 152, *Ninth* expressly *excludes* internal union merger disputes; given the existence of another federal statute conferring jurisdiction, the lead opinion should provide proof that § 152, *Ninth* expressly *includes* such disputes before it creates a conflict between the statutes.

In further support of its proposition that union members' challenge to the validity of their union's merger falls within the exclusive jurisdiction of the NMB, the lead opinion relies heavily on

a decision by our sister circuit, *Minjares v. Indep. Ass'n of Cont'l Pilots*, 293 F.3d 895 (5th Cir. 2002). In *Minjares*, the plaintiffs were union members who sought, in advance of an imminent union vote on a proposed merger, to block the merger because its proposed terms allegedly violated their union's constitution. The Fifth Circuit dismissed the plaintiffs' appeal for lack of jurisdiction, citing the NMB's exclusive authority:

> We recognize that . . . a union's decision to merge into another union could be viewed as a purely internal union matter, having no relationship to the RLA process. However, the practical effect of our interfering with the merger would be a court imposed decision effectively deciding who represents the Pilots. This fact, together with the historically limited role of the courts in enforcing the RLA, leads us to conclude that the RLA affords the sole and mandatory means for resolving the dispute.

*Id.* at 899 (quotations and citation omitted). The Fifth Circuit thereby found a lack of jurisdiction in *Minjares* without examining the text or legislative history of the RLA. Moreover, in reaching its conclusion, the court even acknowledged that internal union matters do not readily fall within the ambit of the RLA, which typically regulates disputes between transportation companies and their employees. This Court is certainly not under any obligation to follow the case, and no other appellate court appears to have followed it either. In light of the dubious basis for the Fifth Circuit's decision, the lead opinion's emphasis on *Minjares* is not convincing.

In short, the RLA simply does not preclude this Court from considering the merits of Plaintiffs' suit.[3]

---

[3]Oddly, the lead opinion quotes an NMB decision holding that a challenge to an organization's "merger" process is an internal union matter unrelated to the RLA, but then appears to distinguish the instant case by noting that Plaintiffs once referred to the SMART merger in their complaint as an "acquisition," as opposed to a "merger." Lead Op. at 16. If there is a reason why a union "acquisition" should be treated as a representation dispute while a union "merger" should not, such

**B.      Title IV of the LMRDA**

Intervenors offer a second, alternative jurisdictional argument: that Title IV of the LMRDA

precludes a federal court from enjoining the merger because the effect of such a decision would be

to abolish new SMART union officer positions for which elections have already been held.  This

argument, which the lead opinion does not reach, is without merit.  Title IV of the LMRDA, 29

U.S.C. §§ 481-83, "establishes a set of substantive rules governing union elections, [§ 481], and it

provides a comprehensive procedure for enforcing those rules, [§ 482]."  *Trbovich v. United Mine*

*Workers of Am.*, 404 U.S. 528, 531 (1972). Under this statute, any union member who seeks to

challenge the fairness of election results may, after exhausting internal union procedures, file a

complaint with the secretary of labor.  29 U.S.C. § 482(a).  The secretary must then investigate the

complaint, and, upon finding probable cause of a violation, must file a civil action against the union

in federal court.  29 U.S.C. § 482(b).  The LMRDA provides that "[t]he remedy provided by [Title

IV] for challenging an election already conducted shall be exclusive," 29 U.S.C. § 483, and the

Supreme Court has confirmed that "suit by the Secretary [is] the 'exclusive' post-election remedy

for a violation of Title IV."  *Trbovich*, 404 U.S. at 531.  Accordingly, this Court has held that "Title

I cannot support a cause of action that seeks to invalidate a previously conducted union election."

*Davis v. United Auto Workers*, 390 F.3d 908, 912 (6th Cir. 2004).

Citing *Davis*, Intervenors argue that Plaintiffs' complaint is substantively a claim based on

Title IV, and not Title I.  However, the facts of *Davis* differed significantly from the facts in this

case.  In *Davis*, the plaintiff, a director of one of his union's geographic unions, disguised his intent

_____

a reason escapes me, and the lead opinion certainly does not provide one.

to seek re-election in order to run unopposed; when he announced his candidacy on the eve of the convention at which the election would take place, a group of union members petitioned the convention to enact a constitutional amendment reorganizing the union's regions and eliminating the plaintiff's region, so as to defeat his eleventh-hour candidacy. *Id.* at 909-10. The plaintiff then filed suit in the district court, seeking rescission of the amendment and his reinstatement as director. This Court noted that although the plaintiff claimed a violation of Title I of the LMRDA, his claim was in substance a claim that his union engaged in unfair election practices. *Id.* at 912. Because only the secretary of labor may file a suit in federal court alleging violations of Title IV, this Court dismissed the suit. *Id.*

Intervenors are correct that *Davis* teaches to look beyond the surface language of a plaintiff's complaint to determine whether the claim is substantively a claim pursuant to Title I or Title IV of the LMRDA. However, in this case, the gravamen of Plaintiffs' complaint is not the invalidity of the UTU's August 2007 officer elections, but rather the invalidity of the merger vote; in contrast, the complaint in *Davis* alleged that the union passed an amendment *for the sole purpose of preventing the plaintiff from winning re-election*, and thus, was in substance an allegation of unfair election practices.

Intervenors' argument is based on the premise that the UTU's August 2007 convention elected SMART officers, and that the injunction would cancel the new officers' election because they would not be able to take the office they were elected to serve. However, the evidence in the record does not support a finding that enjoining the merger would somehow cancel the results of the UTU's August 2007 elections. The Merger Agreement only states that *if* the merger is completed,

those officers would become officers in SMART's new Transportation Division; the failure to consummate the merger means that those officers elected in August 2007 will simply remain UTU officers. Intervenors offer the declaration of one of the candidates for the office of UTU president, who stated that he understood that the race was for the top spot of SMART's Transportation Division. However, the September 2007 edition of the UTU newsletter, in which the election results were announced, clearly states that the election winners "have been elected to lead *the United Transportation Union* into its recently ratified merger[.]" (ROA at 1541) (emphasis added). Thus, the UTU acknowledged what was clear from the Merger Agreement: that the elections were for the purpose of electing UTU officers, not SMART officers, and the failure to close the merger therefore does not invalidate the results of those elections.

Moreover, there is no allegation in the complaint that the August 2007 elections were unfair, or that the UTU violated the LMRDA in the manner in which the elections were conducted–nor do Intervenors make such an argument in their motion to dismiss. Because the fairness of the August 2007 elections is not at issue here, and because Plaintiffs' complaint is entirely focused on the validity of the merger vote itself, the complaint was properly brought pursuant to Title I of LMRDA, and the district court had jurisdiction to hear it.

## II.    Preliminary Injunction

Having found that the district court properly exercised jurisdiction over Plaintiffs' suit, I would further find that the district court did not abuse its discretion in granting the preliminary injunction enjoining the merger.

This Court reviews a district court's order granting a preliminary injunction for abuse of discretion, reviewing the court's factual findings for clear error and its legal conclusions *de novo*. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540-41 (6th Cir. 2007). "An appellate court in reviewing the propriety of a preliminary injunction should refrain from the unnecessary comment on the evidence or review of the merits of the case since the case has yet to be heard in full on the merits." *Christian Schmidt Brewing Co. v. G. Heileman Brewing Co.*, 753 F.2d 1354, 1356 (6th Cir. 1985).

A district court must consider four factors in deciding whether to issue a preliminary injunction: "(1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest." *Tucker v. City of Fairfield*, 398 F.3d 457, 461 (6th Cir. 2005) (quotations and citation omitted). These four factors are "factors to be balanced, not prerequisites that must be met," and "the district court's weighing and balancing of the equities is overruled only in the rarest of cases." *Six Clinics Holding Corp., II v. Cafcomp Systems*, 119 F.3d 393, 400 (6th Cir. 1997).

Although the district court's decision that a litigant is likely to succeed on the merits is a legal question that is reviewed *de novo,* "the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief is reviewed for abuse of discretion." *Certified Restoration Dry Cleaning Network*, 511 F.3d at 541. "The district court's determination will be disturbed only if the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal

standard." *Id.* (citations omitted). "A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake as been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quotations and citation omitted).

"In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics*, 119 F.3d at 402. "However, it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.*

As previously discussed, Title I of the LMRDA safeguards union members' right to take part in nondiscriminatory union voting by recognizing "the right of a meaningful vote," *Sertic*, 423 F.2d at 521, including the right to "sufficient information . . . to allow a reasoned and informed vote on the proposal which appears on the ballot." *Blanchard*, 532 F.2d at 1079. Plaintiffs claim that the UTU's failure to include the two unions' constitutions in the July 2007 mailing that prepared the UTU's members for the merger vote deprived the UTU's members of a meaningful, informed vote; they were unable to discern the extent to which the two constitutions were in conflict, and therefore, could not determine if the merger would weaken their rights as they currently existed under the UTU constitution. In granting Plaintiffs' preliminary injunction motion, the district court found that Plaintiffs had shown "a substantial likelihood of success on their claim that they were deprived of a meaningful vote in the merger referendum" as a result of the UTU's failure to include the constitutions in the merger voting materials. (ROA at 1568-69.)

The UTU-SMWIA Merger Agreement specifically conditioned completion of the merger on UTU members' "approval of this Merger Agreement and of the SMART Constitution." (ROA at 209.) Although the SMART constitution had not been finalized by the time of the merger vote, a comparison of the UTU and SMWIA constitutions would have at least given UTU members the opportunity to understand which provisions of their own constitution might not be imported into the new one. Although the UTU's webpage devoted to the merger included both constitutions, there is a dearth of evidence concerning whether the UTU had previously used website postings to inform its members, or whether web postings could have been a reliable means of informing them. Regardless, none of the UTU's announcements concerning the merger even specified that the constitutions could be located on the UTU website; the "special edition" SMART newsletter included in the mailing only stated that "[t]o stay current, [members could] go to www.utu.org." (ROA at 222.) This reference to the UTU's website hardly constitutes adequate notice that the constitutions could be found there. Because Plaintiffs appear at least to have raised substantial enough questions regarding the extent to which the members' vote was meaningful to make their LMRDA claim "a fair ground for litigation," *see Six Clinics*, 119 F.3d at 402, the district court did not err in finding a likelihood of success.

The other factors in the preliminary injunction analysis all favor Plaintiffs. First, the irreparable nature of the harm alleged in this action is self-evident; it would be extremely difficult for the district court to undo the merger once completed, or calculate plaintiffs' damages resulting from the infringement of their voting rights. Second, although the loss of the immediate cost efficiencies the merger would generate if completed could be harmful to the UTU's financial

interests, the harm to union members would be far greater if the merger goes forward contrary to their interests. Moreover, it is difficult to discern any harm to SMWIA from the merger being delayed, and Intervenors do not present any argument concerning the harm to SMWIA on appeal.

Finally, with respect to the impact of an injunction upon the public interest, the LMRDA reflects Congress' belief that, "in the public interest, it continues to be the responsibility of the Federal Government to protect employees' rights to organize, choose their own representatives, bargain collectively, and otherwise engage in concerted activities for their mutual aid or protection; . . . in order to accomplish the objective of a free flow of commerce it is essential that labor organizations . . . adhere to the highest standards of responsibility and ethical conduct in administering the affairs of their organizations[.]" 29 U.S.C. § 401(a). Thus, the federal courts' enforcement of the right of union members to participate in important union referenda serves the public interest. Intervenors argue that the district court's injunction "promises to paralyze union self-governance[.]" Appellant's Br. at 64. While members' voting rights undoubtedly complicate unions' ability to make decisions, Congress specifically found this constraint to be "necessary to eliminate or prevent improper practices on the part of labor organizations[.]" 29 U.S.C. § 401(c). Intervenors also argue that injunctions in cases such as this one will ultimately cause the UTU and other unions to refrain from holding membership votes on such important decisions like this one, for fear of judicial scrutiny. However, given that the UTU's constitution *requires* its leaders to submit proposed mergers to its members for ratification, this concern appears overstated, at least with respect to the union at issue here.

With all four factors weighing in favor of an injunction, the district court did not abuse its

discretion in granting Plaintiffs' motion and enjoining the merger pending the outcome of the case.

I therefore respectfully dissent.

**HOLSCHUH, District Judge, amended opinion concurring in the reversal of the district court's judgment.**

I fully concur with the first paragraph of Judge McKeague's amended opinion.

Contrary to Judge Clay's criticism of Judge McKeague's introductory paragraph, that paragraph serves to eliminate any confusion that may arise from our three separate opinions. Judge McKeague states that I concur in the judgment of reversal and dismissal of this case and believe that the injunction should not have been issued. That is an accurate description of my opinion. It is my strong belief that under the undisputed facts, no claim has been stated by the plaintiffs upon which relief can be granted under § 101(a)(1) of the Labor-Management Reporting and Disclosure Act of 1959 ("LMRDA"). Accordingly, it may have been unnecessary for me to further state that the injunction should not have been issued on the merits, although I also believe that to be true. Judge Clay's footnote, however, is not correct when he states that "two judges of this court" felt that "Plaintiffs have no venue to pursue their claim." Plaintiffs *did* have a venue to pursue their claim, *i.e.*, the district court's jurisdiction under the LMRDA, but completely failed to support a claim which could be granted under that Act because of the undisputed facts of this particular case.

Judge Clay criticizes Judge McKeague's statement that although there are three opinions in this case, one result is reached. His accusation is that this is a "misleading assertion." To the contrary, it is a true and accurate description of our opinions. The reasoning indeed may be different, but there is only one result from the leading, concurring, and dissenting opinions—reversal of the judgment of the district court.

Judge Clay cites no Sixth Circuit precedent for his remarkable position that because of our disagreements, we should agree to vacate all of our opinions and ask that a different panel of judges be assigned to hear this case. Even if such extraordinary precedent exists in this circuit, and I know of none, I respectfully disagree.[1]

For the reasons set forth by Judge Clay in his decision, I respectfully disagree with Judge McKeague's decision that the district court lacked subject matter jurisdiction in this case on the ground that plaintiffs' claims involved a representation dispute within the exclusive jurisdiction of the National Mediation Board. While I agree with Judge Clay that the district court did have subject matter jurisdiction under the LMRDA, and also that the Secretary of Labor need not have brought this suit, I am of the opinion that the evidence and the law in this case cannot support the issuance of an injunction under that Act, and I therefore would reverse the decision of the district court, vacate its judgment, and order that this action be dismissed.

## I. Introduction

---

[1]     Judge Clay is also critical of my opinion because he is of the belief that I have read circuit precedent "extremely narrowly," an obvious reference to the decision of this court in *Blanchard v. Johnson*, 523 F.2d 1074 (6th Cir. 1976). I find that case to be distinguishable, but it certainly is not unusual for judges to disagree in their reading of the case law. He also faults my opinion because it does not discuss plaintiffs' claims under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and § 101(a)(2) of the LMRDA. The undisputed facts, however, clearly establish that the freedom of speech claim under § 101(a)(2) of the LMRDA is frivolous and that there was no violation of the LMRA because no breach of the Merger Agreement or the UTU Constitution occurred. The union members voted overwhelmingly in favor of the Merger Agreement that set forth, in great detail, how the merger would be accomplished and the merged constitution created.

Plaintiffs' lawsuit is based entirely on a claim that although a great amount of information regarding a proposed merger of their union was given by union officers to the members, it allegedly was not enough in their opinion to permit their vote to be a "meaningful" vote. Of great importance is the fact that they do not allege—nor could they—that there was any discrimination by the officers of the union in the amount of information given to the members of the union or in the manner in which it was given. All members of the union indisputably were treated equally throughout the entire voting process. The claim is that the union officials failed to provide copies of the non-existent SMART constitution and hard copies of the 149-page SMWIU constitution to every union member before the vote, and that this failure deprived the members, under Sixth Circuit law, of a "meaningful" vote. I personally believe that this court has judicially inserted a requirement in a statute, § 101(a)(1) of the LMRDA, that does *not exist*, *i.e.*, a requirement that not only must there be no discrimination in voting, but also that all votes cast must be "meaningful" votes as determined by a federal court examining every bit of information provided in order to render an opinion that enough information has been given or not enough information has been given. The discussion that follows considers the Sixth Circuit's decisions, albeit few in number, regarding this court's creation of this added requirement.

## II. The Right To Have An Equal Vote

Section 101(a)(1) of the LMRDA (sometimes referred to as Title I of the Act or the Act's "Bill of Rights") is a guarantee of the right to be treated equally by union officials. It provides that:

> Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the

> deliberations and voting upon the business of such meetings, subject to reasonable
> rules and regulations in such organization's constitution and bylaws.

29 U.S.C. § 411(a)(1) (2000). By its terms, the statute is directed to concerns of equality of treatment; it requires that all union members be treated equally with respect to a specific set of actions: nominations, voting, attendance at membership meetings, and participation in deliberations and voting. The obvious reading of the plain language of the statute is that it prevents officers of unions from discriminating among the members of the union in these specific events.

This clear reading of the statute was announced by the Supreme Court in *Calhoon v. Harvey*, in which union members claimed their right to nominate candidates under § 101(a)(1) was violated when their union's bylaws and constitution set strict, but uniform, requirements for nominations for officer elections. 379 U.S. 134, 139 (1964). Specifically, the two complaints of the union members were, first, that the bylaws prohibited self-nomination and, second, that the constitution prohibited anyone from being nominated who had not been a "member of the national union for five years and had served 180 days or more of seatime in each of two of the preceding three years on vessels covered by collective bargaining agreements with the national or its subsidiary bodies." *Id.* at 135–36. In its consideration of these complaints, the Court noted that whether the requirements are reasonable and valid "is a question separate and distinct from whether the right to nominate on an equal basis given by § 101(a)(1) was violated." *Id.* at 139. As for § 101(a)(1):

> Plainly, this is no more than a command that members and classes of members shall
> not be discriminated against in their right to nominate and vote. . . . The complaining
> union members have not been discriminated against in any way and have been denied
> no privilege or right to nominate which the union has granted to others.

*Id.* Because "the same qualifications were required equally of all members," the Court continued, there was no "discrimination against their right to nominate." *Id.* Thus, the Court refused to acknowledge that § 101(a)(1) could be violated in the absence of allegations of some union members being treated differently from others. *Id.* at 138–39.

This circuit has repeatedly applied the principle that an equal vote claim may not be brought in the absence of allegations of unequal treatment between members. *See Nienaber v. Ohio Valley Carpenters District Council*, 652 F.2d 1284, 1286 (6th Cir. 1981) (refusing to recognize a § 101(a)(1) violation because "[t]he District Court properly concluded that there was no discrimination between members of the union and no denial of the equal right to vote."); *Corea v. Welo*, 937 F.2d 1132, 1141 (6th Cir. 1991) ("Where there is no discrimination between members of a union there is no denial of the equal right to vote. . . . Thus the issue under [§ 101(a)(1)] is not whether members were treated properly or fairly, but whether they were treated equally."); *Richards v. Ohio Civil Service Employees Ass'n*, 205 F. App'x 347, 353 (6th Cir. 2006) (concluding that even where an optional vote was denied to members completely, "the claim must still allege discrimination linked to the absence of a vote"); *Angel v. United Paperworkers Int'l Union (Pace) Local 1967*, 221 F. App'x 393, 400 (6th Cir. 2007) ("Because the alleged violation of the Union's constitution and bylaws resulted in the universal denial of a ratification vote, rather than the denial of a vote to some but not others, plaintiffs fail to allege the discrimination required by [§ 101(a)(1).]").

Accordingly, because plaintiffs here have made no allegations that they were treated differently from any other member in the information they received from UTU officials, there is no doubt that § 101(a)(1) was not violated based on an equal vote claim.

### III. The Sixth Circuit's Judicially Added Requirement To The Statute That A Vote Must Not Only Be Equal, It Must Also Be "Meaningful."

This circuit has read into § 101(a)(1) the notion that a plaintiff may base a § 101(a)(1) claim on the denial of the right to a "meaningful" vote, not just an "equal" vote. This additional requirement is sometimes said to come from a few cases of this Court, primarily *Blanchard v. Johnson*, 523 F.2d 1074 (6th Cir. 1976) and *Brown v. IBEW Local Union No. 58*, 936 F.2d 251 (6th Cir. 1991). Its roots, however, were planted in a 1970 case that did not even mention the Supreme Court's decision in *Calhoon*.

*Sertic v. Cuyahoga, Lake, Geauga and Ashtabula Counties Carpenters District Council*, 423 F.2d 515 (6th Cir. 1970), ushered into this Circuit the concept that under the LMRDA votes must be "meaningful." Coming just a few years after *Calhoon*, *Sertic* involved a dispute not under § 101(a)(1), but rather under § 101(a)(3), which explicitly guarantees union members the right to vote on the rates of dues and initiation fees.[2] *Sertic*, 423 F.2d 515. The issue in *Sertic* was whether it was a violation of § 101(a)(3) for the union officers to require that a question regarding dues be combined

---

[2]Section 101(a)(3), codified at 29 U.S.C. § 411(a)(3)(2000), provides in part:

> Dues, initiation fees, and assessments
>
> Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or special assessment shall be levied upon such members, except--
>
> (A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot; . . .

with a question regarding a wage increase into just one vote on the ballot. In other words, the members had no opportunity to vote against a dues increase without also voting, at the same time, against negotiations for a wage increase, and vice-versa. Holding that such a ballot did violate § 101(a)(3), the court noted that the purpose of the LMRDA was to ensure "the full and active participation by the rank and file in the affairs of the union." *Id.* at 521 (quoting *American Federation of Musicians v. Wittstein*, 379 U.S. 171, 182–83 (1964)). From this bare statement of the purpose of the LMRDA, the court said that "[u]nion members are entitled under the Act to the right of a meaningful vote on increases in dues or assessments." *Id.* Although § 101(a)(3) was clearly violated in *Sertic*, because the ballot deprived members entirely of the ability to cast a plain "yes" or "no" vote on each question, the court did not discuss what would constitute a "meaningful" vote on increases in dues or assessments. Obviously, a ballot that was worded to include two different issues in one question was not in any sense a fair ballot, but by inserting the words "meaningful vote," the seed for adding a judicially-created requirement to the statute was planted.

Six years later, this court heard a claim that sufficient information concerning a vote had not been given by union officers to the members. This time the claim was made under § 101(a)(1), and the vote was on a proposed merger, for which a vote is not required by the LMRDA, instead of a vote on a dues increase, for which a vote is specifically required. *Blanchard*, 532 F.2d at 1075–76. The officers of a local union that had disaffiliated itself from a national union received proposals from three national unions for a merger. The officers voted to accept the proposal from the International Longshoreman's Association (ILA) and rejected all other proposals. A few members of the local union who wanted a merger with one of the rejected unions (the MEBA) brought an

action to obtain an injunction blocking a vote on the proposed merger with the ILA. The district court acknowledged that the unions' constitution permitted only one proposal to be on a ballot but nevertheless issued an injunction requiring that the officers who had rejected the other proposals also place on the ballot the MEBA proposal favored by the disgruntled union members. In response to the officers' refusal to place the rejected proposal on the ballot, the district court said:

> Such a refusal by union officers, who are, after all, fiduciaries, runs afoul of the policies which underlie ss 411 and 501, *because seriatim balloting in this case may result in unfair advantage for the proposal favored by the union leadership.* Thus the Court will enjoin the use of the constitutional provision and order the MEBA proposal placed on the ballot along with the ILA proposal.

*Id.* at 1077 (emphasis added).

The basis for the district court's injunction was not that a vote on the ILA proposal alone would not have been a "meaningful" vote, but that a vote on the ILA proposal first with a possible vote on the MEBA proposal later could "result in unfair advantage for the proposal favored by the union leadership." *Id.* In other words, the district court believed that seriatim voting would permit the union's officers to discriminate in favor of the officers who liked the ILA proposal as opposed to the members who wanted the MEBA proposal. The district judge then ordered that the MEBA proposal favored by the plaintiffs also be placed on the same ballot. As a result, the precise issue on appeal was whether the district court erred in requiring the rejected MEBA proposal to be put on the ballot alongside the ILA proposal accepted by the union's officers. *Id.* at 1077–78. In the course of holding that the district court erred, this court first discussed relevant case law. It reiterated the purpose of the LMRDA, as stated by the Supreme Court in *Wittstein*, *i.e.*, "there should be full and active participation by the rank and file in the affairs of the union," and then, citing the *Sertic* case,

injected the *Sertic* proposition that "(u)nion members are entitled under the Act to the right of a meaningful vote . . .", *id.* at 1078, *omitting* the remaining language of that sentence—"on increases in dues or assessments." The court, via an incomplete quotation from *Sertic*, created an additional requirement regarding votes that is not contained in the statute, again not elaborating on what could constitute a "meaningful" vote.

The *Blanchard* court vacated the district court's judgment issuing an injunction because the district court's injunction intruded into the internal affairs of the union, but in doing so the court again referred to the "informed vote" concept. It recognized that the Supreme Court, in *Calhoon*, had found that § 101(a)(1) is purely a prohibition against discrimination, and that there is nothing in the LMRDA regarding voting rights that permits a court to interfere in the internal affairs of a union. Referring to the *Sertic* case, the court said:

> This Court, after reviewing the legislative history and judicial consideration of the LMRDA, concluded in *Sertic v. District Council of Carpenters*, 423 F.2d 515, 521 (6th Cir. 1970), that "(u)nion members are entitled under the Act to the right of a meaningful vote . . .."

> However, this Court is not unfettered in its determination of what constitutes "full and active participation" or a "meaningful vote." As the Supreme Court noted in *Calhoon v. Harvey*, 379 U.S. 134, 138–39 (1964), issued the same day as [*Wittstein*]:

>> Congress carefully prescribed that even this right against discrimination is 'subject to reasonable rules and regulations' by the union."

> The Court also state[d]:

>> Plainly, (s 101(a)(1)) is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote. 379 U.S. at 139.

> The Second Circuit in *Sheldon v. O'Callaghan*, 497 F.2d 1276, 1281 (2d Cir. 1974), subscribed to the reasoning in *Allen v. International Alliance of Theatrical Employees*, 338 F.2d 309, 317 (5th Cir. 1964), "(t)his Court recognizes the need to exercise what Judge Wisdom referred to as a 'sound reluctance . . . to interfere in internal union affairs'. The *Sheldon* Court added:
>
> The duly elected officers of a union have a right and a responsibility to lead, and to give the members the benefit of their advice on questions that arise." 497 F.2d at 1282.

*Id.* at 1078 (parallel citations omitted).

In response to the district court's concern about a ballot that included only one proposal, and would result in discrimination in favor of the officers who favored the ILA proposal, the court said that seriatim voting is permitted "so long as sufficient information about all proposals received by the Executive Board is disseminated to the membership to allow a reasoned and informed vote on the proposal which appears on the ballot." *Blanchard*, 532 F.2d at 1079. This, the court continued, would enable the members to exercise their "statutorily guaranteed right to an informed vote." *Id.* Accordingly, *Blanchard* stands basically for the proposition that where a union receives merger proposals from a number of different suitors, union officers need not present every proposal to the members for a vote on each proposal (unless the constitution or bylaws require otherwise); instead, the union officials may present just one proposal for ratification, as long as they give some information about the other proposals in order that the vote on the proposal on the ballot be an "informed" vote and thus not any discrimination by the union officers in favor of the union on its ballot.

What *Blanchard* does *not* involve, however, is an attempt by disgruntled union members to tell the district court that the information provided by the union officials of the terms of the proposal

on the ballot was insufficient. Instead, it involved the concealment by the officers of the terms of other proposals which the officers did not like. Before ordering that the MEBA proposal also appear on the ballot for a vote, the district court had already ordered that simply the *terms* of all proposals must be disclosed, and presumably this is the same information which the district court provided on remand. It is clear that the *Blanchard* court did not discuss, because it was outside the scope of the question presented, whether more information would be required to be provided regarding the terms of the other proposals. *See Corea v. Welo*, 937 F.2d 1132, 1140 (6th Cir. 1991) ("*Blanchard* merely requires full disclosure of the *terms of all proposals* submitted to the membership for a referendum in order to ensure that the vote is meaningful and that the membership has fully participated in the decision making process.") (emphasis in original). *Blanchard* obviously does nothing to advance the idea that the "statutorily guaranteed right to an informed vote" under § 101(a)(1) requires courts to dictate at precisely what point the information presented to union members becomes "sufficient" and their votes become "informed" or at what point the information provided to members becomes insufficient and their votes become uninformed.[2]

---

[2]    Judge McKeague, in footnote 2 of his opinion, incorrectly states that my argument is "that § 101(a)(1) of the LMRDA should be read to only require an equal, as opposed to a meaningful vote." My argument is that (1) the Supreme Court in *Calhoun* and the Sixth Circuit in numerous decisions have held that § 101(a)(1) of the LMRDA is purely an anti-discrimination provision created for the purpose of ensuring that every union member has an equal vote; and (2) a few cases in this Circuit nevertheless contain language, typically in dicta, that has judicially engrafted another requirement on the statute, *i.e.*, that a vote must not only be an equal vote, it also must be a "meaningful" vote, *Sertic*, or an "informed" vote, *Blanchard*. As stated above, I believe that § 101(a)(1) *can* be violated where the union officials' discriminatory conduct *would* render the members' votes meaningless, as in *Blanchard*, but *not* when merely less information than possible has been provided the voters in a non-discriminatory manner.

I am well aware that a decision by one panel of this court cannot overrule the decision of a prior panel. I do not suggest that *Blanchard* is no longer the law in the Sixth Circuit; I do

In *Knox County Local v. Nat'l Rural Letter Carriers' Ass'n*, this court noted that judicial intervention in *Blanchard* was warranted because the union "act[ed] in such a manner as to make that right [to an equal vote] *meaningless*." 720 F.2d 936 (6th Cir. 1984) (emphasis added). The clear import of this statement is that the *Blanchard* court was focused on requiring that the union officials provide *some* information about the other competing unions before a vote could be taken on the union listed on the ballot, which had not been done in that case, rather than on determining *how much* information needed to be given to members. As a result, I believe that the "meaningful vote" line of Sixth Circuit cases should be read to hold that § 101(a)(1) is violated when allegations are made that union officials' omissions or actions rendered the members' votes meaningless, as in *Blanchard* where union officers concealed from the members *any* information about competing proposals, but not when merely *less* information than ultimately could be possible was furnished. Otherwise, any disgruntled union members who voted against a merger could bring an action under the LMRDA by simply alleging that even the smallest amount of information not provided had

suggest—indeed argue—that *Blanchard* is completely distinguishable from the present case and should not be considered as any binding precedent for the proposition that § 101(a)(1) gives any union member who has cast a losing vote in an election the right to have the majority vote set aside if the disgruntled member can convince a district judge that some piece of possibly relevant information could have been provided but was not, without any evidence whatsoever of any discrimination or other wrongdoing on the part of the union's leaders and without any evidence whatsoever that if the missing piece of information had been provided, its importance was so great that the outcome of the election probably would have been different.

Finally, Judge McKeague's opinion that the district court in the present case properly issued an injunction because, in his view, the plaintiffs had shown "a substantial likelihood of success on their claim that they were deprived of a meaningful vote on the merger referendum," is obvious dictum to his position that the district court issuing the injunction had no jurisdiction to do so. This issue, however, is one on which judges can legitimately disagree regarding whether it was an abuse of discretion on the part of a district court in issuing an injunction.

rendered their vote "meaningless" in order to stop or delay a merger of the union that the majority of the members had approved and the plaintiffs had opposed. Such a rule might also, as the intervening defendants point out, discourage unions from having any optional votes, like the one held here. Intervening Defendants-Appellants Reply Brief, at 4.

Plaintiffs cite *Brown v. IBEW Local Union No. 58*, 936 F.2d 251 (6th Cir. 1991) as an example of this court interpreting *Blanchard* to require a full-fledged inquiry into the sufficiency of the information provided to union members. The precise issue in *Brown*, however, was whether the district court failed to recognize certain issues of material fact, making its grant of summary judgment improper. *Brown*, 936 F.2d at 253–54. Specifically, *Brown* involved a vote on a new collective bargaining agreement (CBA) by IBEW Local 58. At an April 1989 meeting of the membership to discuss the negotiations for the proposed CBA, a member of the Local 58 Negotiating Committee, Thomas Butler, expressed his view that a new "standard CIR" clause should be considered, but the union treasurer opposed it and wanted to have a "modified CIR" in the CBA.[3] *Id.* at 253.

On May 24, 1989, the negotiating teams reached an agreement for a new CBA, which included a standard CIR clause. The tentative agreement and ballots were mailed to the membership for a vote. This court found that there was a genuine issue of fact regarding (1) whether Butler did in fact adequately inform his fellow union members that a change in the CIR clause was being

---

[3] "CIR" refers to the Council on Industrial Relations for the Electrical Contracting Industry. A "standard CIR" clause would have allowed unilateral submission of bargaining issues to a Joint Union-Employer Committee at the national level. A "modified CIR" clause would have only allowed submission to the Committee by agreement of both parties.

considered, and (2) whether the union members received the ballots in time to organize opposition to the proposed CBA, there being a dispute as to when the ballots were actually mailed, either May 25 or May 31, with a return deadline of June 14. *Id.* at 253–54. The court, making this finding, reversed the district court's summary judgment for the defendants and remanded the case for further proceedings in the district court. *Id.* at 254.

There are several important facts regarding the *Brown* case. First, everything this court said after its decision on the only issue before the court—whether the district court erred in granting defendants summary judgment—was pure dicta. The discussion plaintiffs cite regarding a review of the sufficiency of information by the district court on remand was not related to the issue on appeal, much less essential to the disposition of the case. Second, there was no finding of any violation of the LMRDA by anyone. Third, *Brown* involved the conduct of union members in negotiating a CBA, *i.e.*, conduct of what one union member told other union members during a union meeting; conduct of the union's officers in sending a packet of materials about the proposed CBA that did not specifically point out the inclusion of a standard, rather than a modified, CIR clause; and conduct of officers agreeing to a debatable timetable for a vote on the proposed CBA. These are all uniquely matters involving the internal affairs of the union.

If *Brown* stands for the proposition that a disgruntled union member who voted against a proposed CBA, approved by a vast majority of the union membership, can stop or delay that agreement from becoming effective merely by filing suit under the LMRDA, alleging misinformation given by a fellow member during a union meeting or a failure of the officers to highlight one change in a proposed new CBA, then *Brown* is, indeed, a troublesome precedent. The reference to *Sertic*

and *Blanchard* and statements as to what might take place back in the district court on remand, however, are dicta, which does not bind the panel of the present case. "[O]ne panel of this court is not bound by dicta in a previously published panel opinion." *United States v. Burroughs*, 5 F.3d 192, 194 (6th Cir. 1993). *See also*, *Johnson v. City of Cincinnati*, 310 F.3d 484, 493 (6th Cir. 2002).

Furthermore, the present case is clearly distinguishable from the claims made in *Brown*. Unlike *Brown*, there is no dispute about what was said or not said in a union meeting; there is no dispute regarding the amount of time given for consideration of any issues involved in the voting process; and there is no issue about the union failing to call the members' attention to a clause in the agreement being considered. It is undisputed that the membership received a complete copy of the agreement, and no claim is made that the terms of the agreement were not fully disclosed or that some provision of the agreement should have been explained to the membership but was not. The alleged violation of the LMRDA in the present case is that the membership was not provided with a copy of a non-existent document, the SMART constitution, and a hard copy of the SMWIA constitution, which, because of the prohibitive cost, was instead posted on the union's website—a decision clearly within the discretion of union officials and a matter directly involving the internal affairs of the union.

A recent decision of this court emphasized that § 101(a)(1) is *solely* an anti-discrimination statute. One of the issues in *Richards v. Ohio Civil Service Employees Ass'n* involved a claim by several union members that a provision in the union's CBA violated the voting provision in § 101(a)(1) of the LMRDA because it deprived the union members of their right to vote on all changes in the CBA. 205 F. App'x 347, 351 (6th Cir. 2006).

In affirming the district court's dismissal of the claimed violation of the LMRDA for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), this court made it very clear that it is now well-established law that § 101(a)(1) is solely an anti-discrimination provision of the LMRDA:

> As the Supreme Court has noted, this statute "is no more than a command that members and classes of members shall not be discriminated against in their right to nominate and vote." *Calhoon v. Harvey*, 379 U.S. 134 (1964). From this proposition flows the corollary that "[w]here there is no discrimination between members of a union there is no denial of the equal right to vote." *Corea v. Welo*, 937 F.2d 1132, 1141 (6th Cir. 1991). This Court further pointed out that "the issue under § 411(a)(1) is not whether members were treated properly or fairly, but whether they were treated equally." *Id.*
>
> \*\*\*
>
> Appellants are correct that this Court has also indicated that an absence of a vote *may* be grounds for a claim of the denial of the equal right to vote, *Corea*, 937 F.2d at 1142, but this does not mean that it *must* be. In order to surmount the 12(b)(6) hurdle, the claim must still allege discrimination linked to the absence of a vote, and Appellants simply have not alleged a colorable claim of discrimination in this case.
>
> \*\*\*
>
> And while this result flows from our Circuit's own precedent, neither are we out of step with other circuits in reaching this conclusion. *See*, *e.g.*, Labor Union Law and Regulation 34–35 (William W. Osborne, Jr., ed., 2003) (noting that the "majority of the appellate courts require *discriminatory* union action and reject the notion that a denial of a right or benefit to *all* members constitutes a basis for finding a [LMRDA] Section 101(a)(1) violation") (emphasis in original).

*Richards*, 205 F. App'x at 353 (parallel citations omitted).

These statements of the Sixth Circuit in *Richards*, albeit in an unpublished decision, accurately describe the established law as announced by the Supreme Court in *Calhoon* that § 101(a)(1) of the LMRDA is purely an anti-discrimination provision, and there is no violation of the

right to vote unless there is a finding of discrimination. There being absolutely no discrimination

in the present case, the alleged failures to provide more information applying to all members equally,

there has been no violation of the LMRDA.

Additionally, it is interesting to note that in *Richards*, the plaintiffs in a companion case also

presented, in the words of the court, "an 'informed vote' claim for damages . . . " under the LMRDA

§ 101(a)(1). In fact, during the course of its decision, this court consistently referred to an "informed

vote" claim as being a claim within quotation marks. As an initial matter, putting the words

"informed vote" claim in quotation marks could well be considered skepticism that such a claim,

absent discrimination, exists under § 101(a)(1) of the LMRDA. Moreover, the court pointed out that,

"[t]he district court noted correctly that a federal court 'is not unfettered in its determination of what

constitutes 'full and active participation' or a 'meaningful vote'' when reviewing a union's voting

affairs. *Blanchard v. Johnson*, 532 F.2d 1074, 1078 (6th Cir. 1976)," but "the district court

nevertheless conducted a thorough analysis of the facts" and concluded that the vote in question was

"informed." *Id.* at 354. The impression given is that it was not necessary for the district court to

have pursued the issue of whether the vote was an "informed vote," but having "nevertheless" done

so, the court of appeals simply found it was not necessary to revisit the issue. *Id.* In this manner,

the court did not have to find again—as the court found earlier in the opinion—that absent evidence

of discrimination there can be no violation of § 101(a)(1) of the LMRDA.

I think *Richards* casts great doubt that the judicially added requirement to § 101(a)(1) of the

LMRDA that a vote by union members on *any* subject, *e.g.,* a proposed merger, a collective

bargaining agreement, a change in locations for the monthly meetings, etc. must not only be equal,

but also must be "informed," is still considered a reasonable interpretation of the statute. I am

convinced that it is not. Furthermore, this case is clearly distinguishable from the misinterpreted

*Sertic* and its unfortunate progeny.

### IV.  The Issuance of the Preliminary Injunction

**A.  The Preliminary Injunction Should Not Have Been Issued as a Matter of Law**

Although the grant of a preliminary injunction is reviewed for abuse of discretion, *Golden*

*v. Kelsey-Hayes*, 73 F.3d 648, 653 (6th Cir. 1996), the improper application of the governing law

by the district court is reason to reverse its decision, *id.*; *Blue Cross & Blue Shield Mutual of Ohio*

*v. Blue Cross and Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997). As discussed earlier, I firmly

believe, as the Supreme Court has said, that § 101(a)(1) of the LMRDA deals solely with assuring

that there is equality in voting and the prevention of union officers from discriminating among the

membership.  There being absolutely no claims or evidence of any discrimination and no claim or

evidence of any fraud or wrongdoing on the part of the union officials, the decision of the district

court to issue an injunction should be reversed, the judgment should be vacated, and this action

should be dismissed.  The Sixth Circuit's judicially created addition to the statute, *i.e.*, the

requirement that the members not only have equal rights in the voting process, but the vote of each

member must be an "informed" or a "meaningful" vote, is the result of dicta that has crept into the

jurisprudence of this circuit.  That requirement is clearly at odds with the text of the statute and this

court's description of § 101(a)(1) of the LMRDA in the *Roberts* case, and it is also clearly at odds

with the fundamental policy of permitting unions to handle their own internal affairs, as expressed

by this court in *Dresden Local 267 v. South Central Ohio District Council*, when the court said,

"[t]here is a well-established, soundly based policy of avoiding unnecessary judicial intrusion into the affairs of labor unions." 992 F.2d 1418, 1425 (6th Cir. 1993) (internal quotation marks omitted). Accordingly, the district court intruded into the internal affairs of the UTU in the present case when it held that § 101(a)(1) was applicable to plaintiffs' claim, making the injunction improper as a matter of law.

## B. In Addition, the Preliminary Injunction Should Not Have Been Issued on the Record Presented to the District Court.

The first of the well-established preliminary injunction factors—and an extremely important factor—is the plaintiffs' likelihood of success on the merits. "The district court's determination of whether the movant is likely to succeed on the merits is a question of law and is accordingly reviewed *de novo*." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007), citing *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005). Furthermore, "a preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed." *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997). *See also*, *Sandison v. Michigan High School Athletic Ass'n*, 64 F.3d 1026, 1037 (6th Cir. 1995) (reversing a grant of injunctive relief based solely on the lack of any likelihood of success on the merits); *Morgan v. Tennessee Dep't of Corrections*, 92 F. App'x 302, 303 (6th Cir. 2004).

With respect to this critically important factor, the only thing the district court said in support of its finding of this factor was as follows:

> Defendants concede that the SMART Constitution was never provided to UTU members prior to their approval of the Merger Agreement. As more fully detailed below in describing the harm suffered by Plaintiffs, the Court finds that the failure to provide such relevant information constituted a failure to disclose the relevant

terms of the proposal between the parties. Plaintiffs, therefore, have demonstrated a substantial likelihood of success on their claim that they were deprived of a meaningful vote.

ROA 1569.

The undisputed fact, of course, is that there was no SMART Constitution in existence that possibly could have been sent to the UTU members. Each of the members, however, received an information packet that included a hard copy of the Merger Agreement that specifically informed the UTU members about the contents of the proposed SMART Constitution. Article I of the Merger Agreement states that the SMART Constitution will consist of the current UTU Constitution, in conformity with the SMWIA Constitution. Article III elaborates that the SMART Constitution "shall be the SMWIA Constitution amended to implement the provisions of this Agreement," including the insertion of the UTU Constitution as Article 21B. ROA 209–10. Any conflicts between the President of SMART (formerly the President of the SMWIA) and the President of the Transportation Division of SMART (formerly the President of UTU) over the terms of the SMART Constitution and the Merger Agreement are to be resolved through arbitration by an arbitrator appointed by the President of the AFL-CIO. ROA 209–19. In light of all this information, the failure to send the UTU members a copy of a constitution of the merged union, which was not even in existence at the time of the vote on the Merger Agreement, is, indeed, a thin reed upon which to rest a finding that plaintiffs are likely to succeed on the merits of their claim of not having enough information to cast a "meaningful" vote.

The second factor to be considered in the issuance of a preliminary injunction is whether plaintiffs would suffer irreparable harm if the injunction is not issued. The district court found that

plaintiffs would suffer irreparable harm if the injunction were not issued because, "[n]o amount of legal maneuvering will be able to 'undo' the merger once it has been completed." ROA 1570. The fact that a completed merger is not easily reversed, however, is not, standing alone, any basis whatsoever for stopping the merger from going forward. There can be no irreparable harm if there has been no wrongful conduct on the part of a defendant against whom the injunction is sought. It is here that, although plaintiffs cannot show that defendants have been guilty of any discrimination or any wrongdoing, they claim that defendants have violated the judicial requirement that a vote on *any* merger of unions must be a "meaningful vote." Plaintiffs' Brief at 20. The district court's finding of "substantial evidence" supporting a violation of this judicially created rule was based on (1) a failure to send a non-existent SMART constitution to the UTU members and (2) a failure to send a hard copy of the SMWIA constitution to the UTU members. ROA 1568–73.

As already noted, there was no SMART constitution to send to the UTU members, and the Merger Agreement expressly told the members in detail exactly how that constitution would be created. If a member was not satisfied with this method of creating a new constitution for the merged unions, the member obviously could vote his or her dissatisfaction by casting a vote against the Merger Agreement. The fact is that the Merger Agreement, which described how the SMART Constitution would be created, was approved by the UTU members by a vote of more than 2 to 1. ROA 183.

With respect to the failure to send a hard copy of the SMWIA Constitution, that document consisted of 149 pages, and sending a hard copy to the UTU's some 68,000 members was cost prohibitive, so therefore a copy was placed on the UTU's website. ROA 811. Should the financial

inability to provide a lengthy written document that is otherwise obtainable on the union's website be considered by the district court? Should there be some indication of what impact the lack of that document had on the voting, *i.e.*, the inability of an UTU member to lay a copy of the UTU Constitution alongside a copy of the 149-page SMWIA Constitution in order to go through each page of the two constitutions to see what conflicts could exist that would ultimately have to be decided by agreement or by arbitration? The district court obviously did not consider either of these two important questions, because they are not mentioned in the court's decision.

The UTU officers and directors, having unanimously approved the Merger Agreement, sent a packet of detailed information about the merger and the resulting SMART union and SMART constitution to each of the UTU members at the last known address of each member. Each packet contained a complete hard copy of the Merger Agreement. It also contained a DVD and materials explaining the merger, including a four-page letter from President Thompson discussing the history and impact of the merger, letters from SMWIA President Sullivan and AFL-CIO President John Sweeney, and a "Special Edition" SMART newsletter with highlights about the merger and that urged members, "[t]o stay current, go to www.utu.org," the UTU's website. ROA 199–229.

Copies of the UTU and SMWIA Constitutions were made available on UTU's website. As noted earlier, these documents were not mailed because the SMWIA Constitution alone totaled 149 pages and the UTU could not afford to mail paper copies to all of its members. ROA 811. Also, the UTU published on its website hundreds of pages of information, including a series of Frequently Asked Questions regarding the merger, in which the UTU President answered questions sent in to him. ROA 1368, 536–807, 1509–29. Plaintiff UTU members Dale Michael, Jimmy Eubanks, and

John Hasenauer each spent time reviewing and analyzing the UTU's ratification materials from the UTU website. ROA 51, 58, 62.

Against this very extensive information provided to the UTU members, the district court found that it was still not enough. "Absent information about the possible changes to their own governing document, the UTU members' votes cannot be said to be meaningful. Accordingly, the Court finds that UTU members were harmed through the failure of their own elected officials to provide them adequate information prior to the vote on the Merger agreement." ROA 1573.

The members, however, *did* receive specific information in their copies of the Merger Agreement "about the possible changes to their own governing document" and how those possible changes could come about and be resolved. What was unknown at the time—and could not possibly have been known until after the UTU convention, when amendments were made to the UTU constitution—was the extent of conflicts, if any, between the two constitutions. The fact that there were some conflicts, many being insignificant, does not mean that the vote approving the Merger Agreement's method of resolving any conflicts was not a "meaningful vote." As this court said in *Corea v. Welo*, 937 F.2d 1132, 1140 (6th Cir. 1991), "*Blanchard* merely requires full disclosure of the terms of all proposals submitted to the membership for a referendum in order to ensure that the vote is meaningful and that the membership has fully participated in the decision making process." In the present case, it is undisputed that all terms of the proposal to be voted upon *were* contained in the Merger Agreement, a copy of which was sent to each member of the union.

Plaintiffs would not suffer any harm, much less irreparable harm, had the preliminary injunction not have been issued, because considering the entire record in this case, there clearly was

no showing that the failure to receive a copy of a non-existent document or a hard copy of the SMWIA Constitution deprived the plaintiffs of a "meaningful vote."

Finally, with respect to the "irreparable" aspect of the alleged harm, even if it is agreed that because completed mergers can be difficult to "unwind," plaintiffs would automatically, by nature of the relief sought, suffer "irreparable harm" if an injunction were not issued, this factor is but one of the four factors to be considered. Normally, not one factor alone is determinative; all must be considered and balanced in order to determine whether, under the particular facts of the case and the law to be applied to those facts, the defendant should or should not be enjoined. *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (citing *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996).

With respect to the third factor, the granting of the preliminary injunction in this case did cause substantial harm to the UTU union, not just because it cost the union over $200,000 to prepare and mail the informational packets and to conduct the ratification vote, ROA 183, (money which can never be recovered) but also, and of more importance, because the preliminary injunction, on the record of this case, violated what this court has described as the "well-established, soundly based policy of avoiding unnecessary judicial intrusion into the affairs of labor unions." *Dresden Local 267*, 992 F.2d at 1425 (quoting *Local No. 48 v. United Brotherhood of Carpenters*, 920 F.2d 1047, 1051 (1st Cir. 1990)).

In this case, for the reasons stated above, the other factors, especially the failure factually to show a likelihood of success and, legally, the application of erroneous law greatly outweigh the dubious harm to the plaintiffs. This conclusion is reinforced by consideration of the final factor.

With respect to the impact of the injunction on the public interest, the district court found that, "[t]he clear policy of the [LMRDA] is to bid farewell to the regime of benevolent well-meaning union autocrats and to give favor to a system of union democracy with its concomitants of free choice and self-determination," quoting the district court's decision in *Blanchard v. Johnson*, 388 F.Supp. 208, 215 (N.D. Ohio 1974), *aff'd in relevant part*, 532 F.2d 1074 (6th Cir. 1976). ROA 1573–74. I agree with this statement, but there is absolutely no evidence that UTU's officers and directors in this case were "benevolent and well-meaning autocrats." To the contrary, they went to great lengths to inform their members of the terms and conditions of the proposed merger, and there is no claim and not a scintilla of evidence of any discrimination. Furthermore, there is an equally clear, and just as important policy of Congress, *i.e.*, that Congress did not intend by the passage of Title I of the LMRDA to interfere in the internal affairs of unions, which is exactly what the district court did in the present case.

## V.  Conclusion

I therefore believe that while the district court had subject matter jurisdiction to consider the plaintiffs' complaint, the district court, for the reasons given, should not have issued the injunction as a matter of law, because there was no evidence of any discrimination by the officers and directors of UTU, and, furthermore, the district court abused its discretion in issuing a preliminary injunction on the record presented to that court. The decision of the district court, therefore, should be reversed, the judgment vacated, and this case remanded to the district court with instructions to dismiss the action.